**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THINK GREEN LIMITED d/b/a HAAKAA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:21-cv-05445 |
| | ) | |
| v. | ) | Hon. Georgia N. Alexakis |
| | ) | Hon. Heather K. McShain |
| MEDELA AG and MEDELA LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# **MOTION TO EXCLUDE EXPERT REPORT OF RHONDA HARPER**

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. LEGAL STANDARD ........ 1

III. ARGUMENT ........ 3

- **A.** Each of Harper's Selected Control Stimuli are Fundamentally Flawed Rendering the Surveys Unreliable. ........ 3
  - **1.** Secondary Meaning Control Stimuli ........ 4
  - **2.** Point-of-Sale Control. ........ 5
  - **3.** Post-Sale Control. ........ 6
- **B.** Harper's Point-of-Sale Confusion Survey Fails to Reflect the Marketplace. ........ 8
- **C.** Harper's Secondary Meaning Test Simulus is Fundamentally Flawed Rendering the Survey Unreliable. ........ 10
- **D.** Harper's Surveys Fail to Assess the Asserted Non-Functional Trade Dress. ........ 11
- **E.** Harper's Secondary Meaning Calculus is Fundamentally Flawed Rendering the Survey Unreliable. ........ 13
- **F.** Harper's Secondary Meaning Statements Lack any Rationale Connecting Purported Evidence to her Conclusion. ........ 13
- **G.** Harper's Post-Sale Confusion Test Stimuli Lacks Any Real-World Substantiation. ........ 14

IV. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Cases**

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.,*
280 F.3d 619 (6th Cir. 2002) ........ 11

*Am. Honda Motor Co., Inc. v. Allen,*
600 F.3d 813 (7th Cir. 2010) ........ 1

*American Footwear Corp. v. General Footwear Co. Ltd.,*
609 F.2d 655 (2d Cir.1979)........ 10

*Clark v. Takata Corp.,*
192 F.3d 750 (7th Cir. 1999) ........ 2

*ConAgra, Inc. v. George A. Hormel & Co.,*
784 F. Supp. 700 (D. Neb. 1992),
aff'd, 990 F.2d 368 (8th Cir. 1993) ........ 8

*Cumberland Packing Corp. v. Monsanto Co.,*
32 F.Supp.2d 561 (E.D.N.Y.1999) ........ 8

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
43 F.3d 1311 (9th Cir. 1995) ........ 1, 13

Deere & Co. v. Farmhand, Inc.,
560 F. Supp. 85 (S.D. Iowa 1982)
aff'd, 721 F.2d 253 (8th Cir. 1983) ........ 12

*Evory v. RJM Acquisitions Funding LLC,*
505 F.3d 769 (7th Cir. 2007) ........ 2

*Gopalratnam v. Hewlett-Packard Co.,*
No. 17-1810, 2017 WL 6398070 (7th Cir. Dec. 15, 2017)........ 2

*Jacobs v. Fareportal, Inc.,*
8:17CV362, 2020 WL 6587245 (D. Neb. May 29, 2020) ........ 14

*Krik v. Exxon Mobil Corporation,*
870 F.3d 669 (7th Cir. 2017) ........ 3

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.,*
661 F. Supp. 2d 940 (N.D. Ill. 2009) ........ 3

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.,*
703 F. Supp. 2d 671 (W.D. Ky. 2010),
aff'd, 679 F.3d 410 (6th Cir. 2012)........ 14

*Munsingwear, Inc. v. Jockey Int'l, Inc.*,
No. CIV. 4-93-538, 1994 WL 422280 (D. Minn. Apr. 21, 1994),
aff'd, 39 F.3d 1184 (8th Cir. 1994) ........................................................................ 15

*Nabisco v. Warner-Lambert Co.*,
32 F. Supp. 2d 690 (S.D.N.Y. 1999)........................................................................ 7

*National Football League Properties, Inc. v. ProStyle, Inc.*,
57 F. Supp. 2d 665 (E.D. Wis. 1999)........................................................................ 2

*Reed-Union Corp. v. Turtle Wax, Inc.*,
869 F. Supp. 1304 (N.D. Ill. 1994),
supplemented (Dec. 13, 1994),
aff'd, 77 F.3d 909 (7th Cir. 1996) ........................................................................ 8

*Simon Property Group L.P. v. mySimon, Inc.*,
104 F. Supp. 2d 1033 (S.D. Ind. 2000) ................................................................ 2, 8

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) ........................................................................ 1

*Straumann Co. v. Lifecore Biomedical Inc.*,
278 F. Supp. 2d, 130 (D. Mass. 2003) ........................................................................ 12

Textron, Inc., v. ITC,
753 F.2d 1019 (Fed. Cir. 1985)........................................................................ 12

Thakore v. Universal Mach. Co. of Pottstown,
670 F. Supp. 2d 705 (N.D. Ill. 2009) ........................................................................ 12

*THOIP v. Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D. N.Y. 2010)................................................................ 2, 3, 8, 10

*Walrus Brands, LLC v. Peaches Uniforms, Inc.*,
12 C 4892, 2018 WL 11453555 (N.D. Ill. Apr. 23, 2018) ............................................ 14

**Other Authorities**

"Reference Guide on Survey Research." Reference Manual on Scientific Evidence, 3rd ed.,
National Academies Press, 2011........................................................................ 15

"Control Foundations: Rationales and Approaches." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2022 ........................................................................ 11

6 McCarthy on Trademarks and Unfair Competition § 32:163 (5th ed. 2017) ............................ 9

Handelman, Jeffery.
*Handelman's Guide to TTAB Practice*, § 18.21, THE USE OF CONTROLS IN SURVEYS ........ 11

Handelman, Jeffrey.
*Handelman's Guide to TTAB Practice*, Second Edition, § 18.15, SURVEYS REGARDING SECONDARY MEANING OF TRADE DRESS OR DESIGN FEATUR ........ 18

Jacoby, Jacob.
"Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys." The Trademark Reporter, vol. 92, no. 4, 2002 ........ 11

*Manual for Complex Litigation, Fourth*, §11.493 (2004)........ 10

Shari Seidman Diamond,
Reference Guide on Survey Research, in Reference Manual On Scientific Evidence ("Diamond on Survey Research") (Federal Judicial Center 2d ed.2000)........ 11

**Rules**

Federal Rule of Evidence 702........ 8

## I. INTRODUCTION

The Court should exclude the purported expert opinions and survey results of Rhonda Harper regarding secondary meaning, point-of-sale likelihood of confusion, and post-sale likelihood of confusion because she applies no reliable survey design to arrive at the survey results or opinions. *See* ECF 287-15, R. Harper Report (Corrected version) dated February 6, 2024 (hereinafter the "Report"). Further, Ms. Harper's analysis of the net survey results are improperly calculated, purposely so to present figures even more so falsely inflated as a result of improper test and control stimuli. Ms. Harper's surveys are simply not grounded in reliable methodologies and deviate far from commonly accepted survey design principles rendering each of her surveys unreliable.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 requires four prerequisites to determine the admissibility of expert testimony: qualifications, sufficient facts or data, the testimony is the product of reliable principles and methods, and reliable application of principles and methods. Fed. R. Evid. 702. A district judge "must ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993).

A court must determine whether an expert's opinions are based upon sufficient facts or data and whether the methodology underlying the opinion is reliable. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) (holding that even a qualified expert cannot testify to opinions if those opinions are not grounded in some recognized scientific method); *see also Am. Honda Motor Co., Inc. v. Allen,* 600 F.3d 813, 817 (7th Cir. 2010) ("[E]ven the most 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set

forth by the Supreme Court in Daubert.") (quoting *Clark v. Takata Corp.,* 192 F.3d 750, 759 n.5 (7th Cir. 1999)).

Factors that district courts consider when assessing the reliability of expert testimony include "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Gopalratnam v. Hewlett-Packard Co.,* No. 17-1810, 2017 WL 6398070, at *4 (7th Cir. Dec. 15, 2017) (citation omitted).

Survey evidence "must comply with the principles of professional survey research." *Evory v. RJM Acquisitions Funding LLC,* 505 F.3d 769, 776 (7th Cir. 2007). Specifically, "[t]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." 6 McCarthy on Trademarks and Unfair Competition § 32:163 (5th ed. 2017) (McCarthy). Survey methodology that is so flawed that it renders the results untrustworthy should be excluded. 6 McCarthy on Trademarks and Unfair Competition § 32:170 (5th ed. 2017) (McCarthy); *National Football League Properties, Inc. v. ProStyle, Inc.,* 57 F. Supp. 2d 665, 668–670 (E.D. Wis. 1999) (A survey report was excluded from evidence because, among other reasons, survey failed to have a control); *Simon Property Group L.P. v. mySimon, Inc.,* 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) (Survey held inadmissible. "If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial."); *THOIP v. Walt Disney Co.,* 690 F. Supp. 2d 218, 219, 231 (S.D. N.Y. 2010) (survey found inadmissible for failing to adequately replicate marketplace conditions and failing to have an adequate control.).

Additional factors affecting the reliability of survey evidence include whether the survey "universe" was properly defined, whether questions were clear, precise, and non-leading, whether "the objectivity of the entire process was ensured," whether the data was accurately reported, and whether the data was analyzed "in accordance with accepted statistical principles." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952 (N.D. Ill. 2009).

The party seeking to introduce expert testimony bears the burden of demonstrating the testimony is admissible by a preponderance of the evidence. *Krik v. Exxon Mobil Corporation*, 870 F.3d 669, 673 (7th Cir. 2017).

## III. ARGUMENT

The Federal Judicial Center recognizes seven factors in evaluating the reliability or trustworthiness of a survey, including whether the data was analyzed in accordance with accepted statistical principles, and the survey process was conducted so as to ensure objectivity. *Manual for Complex Litigation, Fourth*, §11.493 (2004). Ms. Harper's Report lacks objective survey design and fails to analyze the data in accordance with accepted statistical principles.

### A. Each of Harper's Selected Control Stimuli are Fundamentally Flawed Rendering the Surveys Unreliable.

The most concerning lack of objectivity in Ms. Harper's survey designs revolves around Ms. Harper's scientifically unreliable control stimuli. "A control 'should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.'" *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010), quoting Shari Seidman Diamond, Reference Guide on Survey Research, in Reference Manual On Scientific Evidence ("Diamond on Survey Research") at 258 (Federal Judicial Center 2d ed.2000). In failing to include valid controls in her surveys, Ms. Harper's surveys are unable to scientifically control for extraneous factors that affect a survey's

measures. ECF287-17, Botner Decl. ¶¶ 16-17. "To avoid manipulation of the survey results through the use of an improper control, one should exercise care in choosing a control that is free of bias or leading effect." Handelman, Jeffery. *Handelman's Guide to TTAB Practice*, § 18.21, THE USE OF CONTROLS IN SURVEYS.

Ms. Harper selected three control stimuli that violate the well-accepted standard that a control "should not be so different that it artificially lures respondents away from revealing the effect of noise." ECF 287-17, Botner Decl. ¶ 21, citing Diamond, Shari Seidman. "Control Foundations: Rationales and Approaches." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2022, p. 255. As more fully outlined below, these control stimuli are essentially so wildly different from the asserted trade dress and which introduce a number of confounding elements such that "any conclusions that Ms. Harper draws from her surveys regarding likelihood of confusion or secondary meaning attributed to the disputed trade dress elements are unsupported by her surveys." ECF 287-17, Botner Decl. ¶ 25. Further, if anything, control stimuli should cut against the party proffering the survey. ECF 287-17, Botner Decl. ¶ 27, citing Jacoby, Jacob. "Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys." The Trademark Reporter, vol. 92, no. 4, 2002, p. 929. Ms. Harper's stimuli are unable to scientifically control for extraneous variables such as participants' pre-existing attitudes or tendencies to guess and are scientifically invalid. *Id.* ¶¶ 16-21.

**1. Secondary Meaning Control Stimuli**

Ms. Harper's Secondary Meaning survey inappropriately utilized a *manual* breast pump that requires constant physical manipulation as a control stimulus – a stimulus that introduces at least the following extraneous elements rendering it unreliable: (A) product function – the

control includes a manual hand pump that differs significantly from the vacuum seal collector that does not require pumping; (B) product components – the control introduces additional pieces, such as the pump lever, the screw-on breast shield that connects to the bottle, and the bottle stem that leads up to the shield; (C) bottle style – the control features a non-collapsable bottle design with a screw top in lieu of a collapsable silicone pump; (D) product color – the control includes a combination of clear and solid-colored parts versus an entirely clear design. ECF 287-17, Botner Decl. ¶ 22.

| Test Stimuli | Control Stimuli |
|---|---|
|  |  |

**2. Point-of-Sale Control.**

Harper selects yet another improper control stimulus for her Point-of-Sale Survey, depicting an in-bra wearable breast pump which introduces at least the following differences in appearance and features wholly unrelated to the asserted trade dress elements when compared to the test stimuli: (A) product shape – the control depicts an oval shape versus a bottle shape; (B) product function – the control is a wearable in-bra breast pump versus a bottle design; (C) product components – the control product functions with two separate pieces, a frame and a pouch, whereas the test product is a single-bottle one-piece design; (D) price – the control is more than three times the price of the test product; (E) star rating – the control has 4.0 stars based on 365 ratings versus 4.5 stars based on 94 ratings. ECF 287-17, Botner Decl. ¶ 22.

<table>
<tr><th>Test Stimuli</th><th>Control Stimuli</th></tr>
<tr><td>
</td><td>
</td></tr>
</table>

### 3. **Post-Sale Control.**

Ms. Harper's post-sale confusion survey presents both test and control stimuli where the visibility of the respective products are nearly entirely obscured. As explained by Dr. Botner, Ms. Harper's survey failed to present respondents with images of the Medela product from which they would have been able to see the purportedly non-functional elements that form the asserted trade dress because of the combination of especially small thumbnail images and the various elements in the images that further obscured the Medela product. ECF 287-17, Botner Decl., ¶ 35. Not only that, but the selected control stimuli introduces a number of extraneous elements rendering the control stimuli improper: (A) product shape – the control depicts an oval shape versus a bottle shape; (B) product function – the control is a wearable in-bra breast pump versus a bottle design; (C) contextual factors – the control images include different people, different backgrounds, and use in different circumstances; (D) presence of other products – the control product introduces an extraneous product (the bottle in the lower left above the control product) that is in no way related to the asserted trade dress elements; (E) product components – the control product functions with two separate pieces, a frame and a pouch, whereas the test product is a single-bottle one-piece design; (F) image quality – the control images are more blurry and grainy relative to the test images. ECF 287-17, Botner Decl. ¶ 22.

| Test Stimuli | Control Stimuli |
| --- | --- |
|  |  |

Perhaps most astounding regarding the selection of these improper stimuli is that Ms. Harper was well-aware of at least ten other *one-piece* silicone breast pumps that Think Green has asserted lack its asserted trade dress, one of which includes the same Lansinoh product that Medela featured in its commissioned survey demonstrating a complete lack of point-of-sale likelihood of confusion. Ms. Harper's Report includes a table of these purportedly alternative non-infringing designs, yet still decided to choose drastically different products as controls. *See* Harper Report, ¶ 73 (including table titled "Bottle Type Silicone Breast Milk Pump Collector Shapes"); *see also* ECF 287-17, Botner Decl. ¶¶ 19, 26, 34, 37.

This decision goes against basic principles of selecting a reliable control, designed to be as similar as possible to the test item, while not including any element under dispute. ECF 287-17, Botner Decl. ¶ 18, citing Diamond, Shari Seidman. "Reference Guide on Survey Research." Reference Manual on Scientific Evidence, 3rd ed., National Academies Press, 2011, p. 399. In light of the sheer number of confounding elements in the images of the controls Harper selected for each of the respective three surveys, these controls simply fail to constitute a valid control. *See* ECF 287-17, Botner Decl. ¶¶ 20-25.

Although Ms. Harper's controls fall broadly under an umbrella of breastfeeding pumps, the selected controls are simply much too dissimilar from the asserted trade dress to control for any noise. *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999) (granting

summary judgment to defendant; "Plaintiffs' control product was Trident gum. Although Trident is a gum product, it fails to capture the essence of the allegedly confusing quality at issue, namely the "Ice" term [from "Dentyne Ice"] or some variation of that theme. Trident, therefore, does not represent a suitable 'control product' for this type of survey. Thus, plaintiffs' results cannot be sufficient as proof of meaningful actual confusion between the products.").

Failure to employ adequate controls provides grounds to disregard the surveys and hold the surveys to be inadmissible. *See, e.g., Simon Prop. Group L.P. v. mySimon, Inc.,* 104 F. Supp. 2d 1033, 1045-46 (S.D. Ind. 2000) (holding likelihood of confusion survey to be inadmissible, in part due to failure to employ adequate controls); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F.Supp.2d 561, 574–75 (E.D.N.Y.1999) (rejecting survey as unreliable, in part because controls failed to use names similar to plaintiff's product and failed to account for legally irrelevant causes of potential confusion); *Reed-Union Corp. v. Turtle Wax, Inc.,* 869 F. Supp. 1304, 1311 (N.D. Ill. 1994), supplemented (Dec. 13, 1994), aff'd, 77 F.3d 909 (7th Cir. 1996) (rejecting survey principally due to improper control); *see also ConAgra, Inc. v. George A. Hormel & Co.*, 784 F. Supp. 700, 730 (D. Neb. 1992), aff'd, 990 F.2d 368 (8th Cir. 1993) (control product held to be not a good control because it was not sufficiently similar to the trademarks and trade dresses of the products at issue in the case).

In short, Harper's control stimuli are apparently as dissimilar as possible from the alleged trade dress to unreliably stack the deck in the Plaintiff's favor and thereby depart from scientifically reliable methodologies.

**B. Harper's Point-of-Sale Confusion Survey Fails to Reflect the Marketplace.**

It is a well-accepted principle of survey design that a survey must reflect how consumers encounter a product in the real-world marketplace. *THOIP, supra*. Here, Ms. Harper selected

product thumbnail views plucked from an overall search page option on BuyBuyBaby.com[1] instead of presenting the full scope of information available to a prospective online purchaser. *Compare* Harper Report, ¶ 139, Figure 6 BuyBuyBaby.com Search Results to ¶ 140, 145. These stimuli are carefully crafted to remove various aspects of how consumers actually encounter these stimuli – first, these are but two of *many* thumbnails a consumer would have available to view *concurrently* on the same webpage as reflected in Ms. Harper's Figure 6. However, Ms. Harper has dissected these thumbnails from the thumbnails' respective placement on a webpage and placed them in isolation for the survey.

Secondly, these thumbnails are particularly devoid of a host of further identifying information that consumers would typically encounter by viewing the actual product listing page for these products. As evident by the attached Exhibit B, the full product listing for Medela's Silicone Breast Milk Collector includes imagery of Medela's physical product packaging, additional instances of Medela's signature butter yellow throughout the listing, a bullet point list of product features, and the ability to "click to expand" any of the images in the listing. Equivalent details from the full product listing for the Elvie Curve Manual Breast Pump are similarly devoid from the isolated thumbnail view of the product (packaging, additional more legible instances of the "Elvie" branding, a bullet point list of product features, and the ability to "click to expand" any of the images in the listing).

Ms. Harper's point-of-sale stimuli are so narrowly tailored so as to have eliminated the way consumers actually encounter the products in the marketplace. This failure to adequately

---

[1] Ms. Harper's selection of images from BuyBuyBaby.com is in and of itself – confusing – despite emphasizing Think Green's "dominate market position" on Amazon and having conducted numerous Amazon.com searches and relying on various Amazon webpages in her report. Harper Report, ¶¶ 50, 57 FN 33, 60 FN 37, 71 FN 54, 72, 87 FNs 66 and 67, 88 FN 71. By contrast, Medela's likelihood of confusion survey did specifically examine respondents' views of Amazon. *See* Dkt. 77.

reflect the marketplace exacerbates Harper's critically flawed control stimuli and is therefore likely to inappropriately influence survey respondents' answers in Think Green's favor. Furthermore, this failure to reflect actual marketplace conditions provides grounds for inadmissibility. *See THOIP*, 690 F. Supp. 2d at 231; *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 n. 4 (2d Cir.1979) (holding district court decision to exclude survey "for failure to conduct it under actual marketing conditions" not clearly erroneous).

### C. Harper's Secondary Meaning Test Simulus is Fundamentally Flawed Rendering the Survey Unreliable.

Commonly accepted survey design principles indicate that a secondary meaning test stimulus must isolate the trade dress at issue.[2] *See, e.g.*, *THOIP*, *supra*; Handelman, Jeffrey. *Handelman's Guide to TTAB Practice*, Second Edition, § 18.15, SURVEYS REGARDING SECONDARY MEANING OF TRADE DRESS OR DESIGN FEATURES ("The stimulus should show only the design at issue, not any accompanying word marks or other extraneous matter. The image shown to the respondents **must agree with the image shown in the application** or registration drawing, so that the perceptions of the respondents are tied directly to the subject matter at issue. If the image used in the stimulus differs from the mark shown in the application or registration drawing, the difference will weigh against the probative value, if any, to be accorded to the survey." Emphasis added).

[2] Acceptable test stimuli differ in likelihood of confusion and secondary meaning surveys – in a likelihood of confusion survey, respondents "should be shown the product in its totality as it would appear in the marketplace. In a secondary meaning survey, by contrast, respondents should be shown only the product or design feature(s) for which secondary meaning is claimed." Handelman, Jeffery. Handelman's Guide to TTAB Practice, Second Edition, § 18.15,SURVEYS REGARDING SECONDARY MEANING OF TRADE DRESS OR DESIGN FEATURES.

Here, Harper's test stimulus was a series of images of a Gen 2 version 2 Haakaa – despite Ms. Harper's claim that the test stimuli was edited to remove "all any other indicia of origin" in order "to isolate the proper trade dress elements" the Haakaa is easily identifiable by the distinctive ridge around the breast shield – an element of its products that Think Green has explicitly disclaimed as part of the trade dress both in this proceeding and in its application before the USPTO.[3] This "fundamentally inadequate control" is undoubtedly likely to further skew responses from the survey participants receiving images of the test stimuli. ECF 287-17, Botner Decl. ¶ 43. Ultimately this is yet another example of the biased nature of Ms. Harper's survey design.

| Claimed Trade Dress | Harper's Secondary Meaning Test Stimuli |
| --- | --- |
|  |  |

**D. Harper's Surveys Fail to Assess the Asserted Non-Functional Trade Dress.**

The only design Plaintiff has argued is non-functional is the specific, nine-element design detailed by Mr. Fletcher. Harper's surveys, however, did not test this design. Harper's test stimuli presented a generic "shield-bulb-base arrangement"—an arrangement whose generality this Court has already criticized as functional. *See* ECF107 at 529-30. Functional designs are not protectible, regardless of evidence of secondary meaning. *See Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 638 (6th Cir. 2002) ("[G]eneric product

[3] Think Green has also admitted that the date of first sale of the version of the product bearing this distinctive ridge (Gen 2, version 2) did not occur until June 12, 2019 – contrary to Ms. Harper's broad reliance on a 2016 release date in her Marketing Analysis. *Compare* ECF 287-20 (USPTO submission) with Harper Report, ¶ 44.

configurations are not protectable as trade dress under § 43(a)."); *Deere & Co. v. Farmhand, Inc.*, 560 F. Supp. 85, 98 n.25 (S.D. Iowa 1982) ("Any secondary meaning associated with functional features is, of course, irrelevant since no functional feature may be given protection under 15 U.S.C. § 1125(a)."), *aff'd*, 721 F.2d 253 (8th Cir. 1983).

For example, in her secondary meaning survey, Harper presented respondents with an image in which the features detailed by Mr. Fletcher as essential to establishing non-functionality are not apparent—particularly given that respondents viewed these images on a small, smartphone screen. ECF 287-15 at ¶ 224; ECF 287-17 at "vmobiledevice" variable; ECF 287-17, Botner Decl. ¶¶ 35-36. The same was true of the image of the Medela product used in the confusion surveys.

Plaintiff cannot rely upon one design to establish non-functionality, and present a different design to prove secondary meaning. Because Ms. Harper's opinions on secondary meaning rely upon a design that Plaintiff has not established is non-functional, her evidence is irrelevant.[4] *See Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d, 130, 138 (D. Mass. 2003) (survey provided no evidence that non-functional features have achieved secondary meaning) (citing *Textron, Inc., v. ITC*, 753 F.2d 1019, 1027 (Fed. Cir. 1985) (when overall design is functional, the evidence must show that the individual, non-functional features have acquired secondary meaning)). Plaintiff bears the burden of establishing that the conditions of Ms. Harper's out-of-court experimentation are germane to the issues in the litigation. *See Thakore v. Universal Mach. Co. of Pottstown*, 670 F. Supp. 2d 705, 727-28 (N.D. Ill. 2009).

[4] In fact, Harper herself acknowledges that her survey cannot establish secondary meaning of the asserted trade dress features. Ex. 14 at ¶ 211 ("[I]t is my understanding that determination whether a product <u>feature</u> acquired secondary meaning **<u>should not be shown</u>** from a survey testing source identification of an overall product configuration when most of the product's configuration is functional.").

Absent the requisite correlation, the comparison cannot "logically advance [ ] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995).

**E. Harper's Secondary Meaning Calculus is Fundamentally Flawed Rendering the Survey Unreliable.**

Setting aside Ms. Harper's unreliable test and control stimuli selection, Ms. Harper's presentation of the resulting calculus is egregiously erroneous. Ms. Harper calculated net secondary meaning by comparing the percentage of test respondents indicating the Plaintiff's product is associated with one company/brand minus the percentage of control respondents who associate the control product with one company *and stated the control comes from Haakaa*¸ instead of subtracting the percentage of control respondents indicating an association with any one company/brand. Ms. Harper's calculation fails to follow the accepted methodology and thus overstates the measure of the survey. ECF 287-17, Botner Decl. ¶¶ 39-40. Thus, Ms. Harper erroneously reports a net 52.12% (54.00% - 1.88%) finding of secondary meaning. *Id*. Correcting for this erroneous calculus, Ms. Harper's secondary meaning conclusion is overstated by 32% - in other words, Ms. Harper's survey (putting aside the fatal stimuli flaws) at most demonstrates a 20% net secondary meaning finding. *Id.*

**F. Harper's Secondary Meaning Statements Lack any Rationale Connecting Purported Evidence to her Conclusion.**

Harper's Report contains references to sales data, advertising expenditures, awards, social media followers, [etc.] and concludes that all of these purported statistics evidence the alleged secondary meaning of Think Green's three-part-configuration of its trade dress. Despite having been questioned on the vast majority of these data points prior to authoring her current Report, Harper yet again fails to substantiate the connection between these data points with her conclusion that these were purportedly successful in connecting Think Green as the source of the

trade dress in the minds of relevant consumers. *See Walrus Brands, LLC v. Peaches Uniforms, Inc.*, 12 C 4892, 2018 WL 11453555, at *9 (N.D. Ill. Apr. 23, 2018) (granting defendant's motion *in limine* to bar plaintiff's expert from testifying for failing to give rationale connecting facts relating to his conclusion of secondary meaning). These purported data points further indicate Harper's lack of understanding of how such circumstantial considerations are relevant to the secondary meaning inquiry.

### G. Harper's Post-Sale Confusion Test Stimuli Lacks Any Real-World Substantiation.

Harper selected stimuli that blatantly obscure the appearance of both the accused product features of Medela's product as well as the control stimuli. *See* ECF 287-17, Botner Decl. ¶ 35. While these images may appear in Medela's and the Elvie's respective product listings online, Harper's survey should not be designed to test effectiveness of *marketing material* and instead must reflect real-world conditions in which consumers are likely to encounter the products under the conditions Courts consider for post-sale confusion surveys for the same reason that Ms. Harper's point-of-sale survey fails to adequately reflect marketplace conditions. Harper's survey simply lacks *any* substantiation that these images reflect real-world instances in which a substantial portion of consumers have the possibility of encountering these products. *See Jacobs v. Fareportal, Inc.*, 8:17CV362, 2020 WL 6587245, at *7 (D. Neb. May 29, 2020) (criticizing Rhonda Harper opinion in part because there was nothing definitive before the court that indicated tested conditions reflected real world conditions, and further criticizing Harper's lack of understanding as to the importance of this point in evaluating the admissibility of survey testimony); *see also Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 694 (W.D. Ky. 2010), aff'd, 679 F.3d 410 (6th Cir. 2012) (survey "created an environment that was dissimilar to that in which a typical consumer would encounter the products"). In light of the

obvious intimate and exposed nature of using a collector, it makes Ms. Harper's suppositions all the more unlikely. *See Munsingwear, Inc. v. Jockey Int'l, Inc.*, No. CIV. 4-93- 538, 1994 WL 422280 (D. Minn. Apr. 21, 1994) (rejecting post-sale confusion argument where underwear is inherently concealed), aff'd, 39 F.3d 1184 (8th Cir. 1994).

## IV. CONCLUSION

In sum, Harper's Report is so lacking in necessary substantiation, devoid of acceptable survey design, and are deficient in appropriate calculations such that her opinions associated with the three surveys (secondary meaning, point-of-sale likelihood of confusion, and post-sale likelihood of confusion) are collectively so flawed as to be completely unhelpful to the trier of fact that her Report should therefore be inadmissible.

Dated: October 11, 2024

Respectfully submitted,

/s/ *Thomas L. Duston*

Jeremy R. Kriegel
Thomas L. Duston
Michael R. Weiner
Katherine Nuehring Su
Kelley S. Gordon
John Lucas
MARSHALL, GERSTEIN & BORUN LLP
233 S. Wacker Dr., Suite 6300
Chicago, IL 60606
T: 312.474.6300
F: 312.474.0448
E: jkriegel@marshallip.com
E: tduston@marshallip.com
E: mweiner@marshallip.com
E: knuehringsu@marshallip.com
E: kgordon@marshallip.com
E: jlucas@marshallip.com

*Counsel for Defendants*
*Medela AG and Medela LLC*