UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THINK GREEN LIMITED,

      Plaintiff,

      v.

MEDELA AG and MEDELA LLC,

      Defendants.

No. 21 CV 5445

Judge Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

Think Green Limited ("Think Green") sues Medela AG and Medela LLC ("Medela") under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), for infringing on the trade dress rights it holds in its breast pump, and under both the Lanham Act, § 1125(a)(1)(B), and the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 e*t seq.*, for false advertising. Medela now moves for summary judgment on Think Green's trade dress and false advertising claims. Think Green moves for partial summary judgment on an issue relevant to its trade dress claim (the likelihood of post-sale confusion). The parties also have filed two motions apiece to exclude or strike expert testimony.

For the reasons explained below, the Court denies Medela's motion for summary judgment as to Think Green's trade dress claim and grants it as to Think Green's false advertising claim. [281]. The Court denies Think Green's motion for partial summary judgment, [274], and denies all four motions to exclude and strike, [292], [295], [303], [331].

## I. Relevant Facts and Procedural History

The relevant facts and procedural history are recounted in the summary judgment order of the court previously assigned to this matter. *See* [185] at 2–4.

To summarize: Think Green and Medela both sell manual, one-piece silicone breast pumps.[1] The pumps are pictured below, with Think Green's pump on the left and Medela's pump on the right within each image:



[275] at 2.

_____

[1] The parties refer to the at-issue product as a "pump," "collector," or "silicone manual breast milk collector." Occasionally, Think Green's pump is referred to by the company's other name, "Haakaa." For purposes of this order, the Court will refer to the product at issue as a pump.

Think Green claims trade dress rights in the "three-part shield-collector-base configuration, wherein the collector is bulbous yet fits underneath the outer diameter of the shield and contains an ornamental rib in its top part, while the base flares out from the bottom of the collector bulb to meet the surface upon which the whole unit rests." [1] ¶ 18. Think Green has accused Medela of infringing on its design patent, infringing on its trade dress, and false advertising. *See generally* [1].

After granting Think Green's temporary restraining order, the district court earlier assigned to this matter denied Think Green's motion for a preliminary injunction. [185] at 3–4. The parties later filed motions for summary judgment. *Id.* at 4. The earlier court granted Medela's motion for summary judgment as to Think Green's design patent claim but denied the parties' motions with respect to the trade dress claim, finding them premature. *Id.* With the benefit of discovery, the parties now renew their motions for summary judgment on Think Green's remaining claims. They also move to exclude various expert opinions, which is where the Court begins its analysis.

## II. Motions To Exclude Expert Opinions

### A. Rhonda Harper

Harper, a Think Green expert witness in areas involving marketing, branding, and consumer research, used various analytical methods to conclude that (1) among the relevant universe of consumers, there is a likelihood of confusion that Medela's pump is sponsored or approved by Think Green due to the allegedly infringing trade dress; and (2) the relevant universe of consumers would likely ascribe secondary

meaning to Think Green's trade dress. *E.g.*, [287-15] ¶¶ 2, 3, 29, 30. Medela seeks to exclude Harper's expert opinions and underlying survey results pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See generally* [303]. Medela also seeks to strike Harper's rebuttal declaration. [331]. The Court denies both of Medela's motions.

### 1. Admissibility of Survey Evidence, Generally

Admissibility of survey evidence is governed by Rule 702 and the principles outlined in *Daubert*. Courts generally find consumer survey evidence admissible if a qualified expert testifies that the survey was conducted according to generally accepted principles of survey research. *See Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003). The criteria for the trustworthiness of survey evidence are that:

> (1) the universe was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles; and (7) objectivity of the entire process was assured.

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 952 (N.D. Ill. 2009) (cleaned up). Medela argues that Harper's surveys fail to abide by the sixth and seventh criteria. [303] at 3.

Survey evidence need not be perfect to be admissible. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993). "Shortcomings in

survey results typically affect the weight of the survey, not its admissibility." *Bodum USA, Inc. v. A Top New Casting, Inc.*, No. 16 C 2916, 2017 WL 6626018, at \*6 (N.D. Ill. Dec. 28, 2017) (citing *AHP*, 1 F.3d at 618); *see also id.* at \*7 (explaining that whether a particular survey question "could have resulted in sampling bias … goes only to the weight of the survey"). No survey is "foolproof" or beyond criticism. *See Uncommon, LLC, v. Spigen, Inc.,* 926 F.3d 409, 417 (7th Cir. 2019); *Simon Prop. Group L.P. v. mySimon, Inc.* 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000). And while a survey may be of so little utility that it is irrelevant and therefore inadmissible, *see LG Elecs.,* 661 F. Supp. 2d at 952, such situations are rare, *see AHP*, 1 F.3d at 618.[2]

For the reasons explained next, Harper's surveys do not constitute one of those "rare" situations where fundamental flaws render them "completely unhelpful to the trier of fact and therefore inadmissible." *AHP,* 1 F.3d at 618.

### 2. Admissibility of Harper's Survey Evidence

Medela attacks the admissibility of Harper's survey evidence in numerous respects. The Court addresses each critique in turn.

---

[2] *See also McGraw–Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1172 (7th Cir. 1986) (district court's concern about the "manner of presentation to the interviewee goes to the weight to be accorded to the survey results rather than providing a reason to ignore the survey evidence altogether"); *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at \*4 (N.D. Ill. Mar. 29, 2022) ("Even viewed cumulatively … These types of technical defects and study design choices may lessen the evidentiary weight to be afforded but do not leave the surveys so flawed as to be unreliable or unhelpful to a trier of fact."); *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018) ("Courts rarely exclude consumer surveys from evidence, since most 'shortcomings' go to 'the proper weight of the survey' rather than admissibility."), *aff'd*, 926 F.3d 409 (7th Cir. 2019).

***Control Stimuli in Secondary Meaning and Point-of-Sale Confusion Surveys:*** Medela takes issue with the control stimuli Harper used in her secondary meaning and point-of-sale confusion surveys. [303] at 3.

The purpose of a secondary meaning survey is to determine whether consumers associate the allegedly infringed design features with a particular producer. *See adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 754 (9th Cir. 2018). Harper designed her secondary meaning survey to "determine whether Haakaa's asserted trade dress, as embodied in the Haakaa breast milk pump/collector … has secondary meaning in the relevant category among relevant consumers in the United States." [287-15] ¶ 210.

The online survey presented half of the respondents (the "test group") with photos of Think Green's trade dress, pictured immediately below, and asked those respondents whether they associated the pump with one particular company or brand, and if so, which brand and why. *Id.* ¶¶ 224–38.



The other half of the respondents (the "control group") was presented with photos of a different pump, pictured below, and asked the same questions. *Id.* ¶ 229.

*Control Stimuli*



With respect to the point-of-sale confusion survey, Harper designed that survey to "determine whether [Medela's] breast milk pump/collector is likely to cause forward point-of-sale consumer confusion." *Id.* ¶ 127. Forward point-of-sale consumer confusion involves a consumer's misimpression at the point of sale (for example, a store shelf or an Amazon listing) that the trade dress's older user is the source or sponsor of the newer user's product. *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023) ("A classic example of forward confusion lies where a consumer mistakenly believes that a counterfeit purse she buys is from her favorite Parisian fashion house because the fabric or buckle of the purse features the well-known mark of that fashion house.").

In Harper's online survey, the test group was presented with an image of Medela's pump, captured from the website buybuybaby.com, which included the "MEDELA" brand name; the product's name, the Medela® Silicone Breast Milk Collector; its price; and an image of the pump that included a lanyard and yellow stopper. *Id.* ¶ 140. That image follows:



The control group was presented with an image of a different, "wearable" breast pump, offered by a company called Elvie, drawn from the same website, with the same features (brand name, product name, price-point) pictured. *Id.* ¶ 145. That image follows:



The survey ultimately asked respondents whether or not "the manufacturer or brand of the breast milk pump/collector [they] just reviewed … is sponsored or approved by another manufacturer or brand." *Id.* ¶ 149. If a respondent answered yes to the "sponsored or approved" inquiry, the respondent was then asked what other manufacturer or brand had sponsored or approved the pump or collector the respondent had just viewed and why the respondent thought so. *Id.* ¶ 151.

Medela takes issue with the pump images that members of both control groups were shown—in other words, the control stimuli. [303] at 4–6. Relying on its expert, Keith Botner, Medela argues that the control stimuli are "so wildly different" than the test stimuli that Harper's surveys are unreliable. *Id.* at 4; *see also id.* at 5 (arguing that the control stimulus in the point-of-sale survey introduced numerous "differences in appearance and features wholly unrelated to the asserted trade dress elements").

But as Think Green points out, it is not imperative that secondary meaning surveys include a control group at all to be considered reliable. [319] at 3. As at least one district court has observed, secondary meaning surveys measure the extent to which consumers associate a particular trade dress with a particular source, and a control group would not necessarily aid in that analysis. *See Honestech, Inc. v. Sonic Sols.*, No. A-08-CA-922-SS, 2009 WL 10699727, at *4 (W.D. Tex. Dec. 7, 2009) ("A secondary meaning survey is not intended to establish causation, but to measure the extent to which consumers associate a particular product name with a single source. Thus, such a survey does not require a control group as a matter of course."); *see also*

*Honestech, Inc. v. Sonic Sols.,* 420 F. App'x 359, 364 (5th Cir. 2011) ("[T]he district court did not abuse its discretion in admitting [the secondary meaning] survey. The survey, although not perfect, was sufficiently reliable to be admitted; in other words, any methodological errors spoke to its weight, not its admissibility.").

In a similar vein, another court in this District—while recognizing the valid role that control groups or questions may play in secondary meaning surveys— nevertheless concluded that an expert's failure to include any control at all was "not so obviously fatal as to render [the expert's] testimony inadmissible." *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 5612340, at *20 (N.D. Ill. Sep. 22, 2015). The *Black & Decker* court noted that the expert's surveys still "contain[ed] 'further probing' into the basis for the respondents' belief as to who makes the pictured or described product." *Id.* That is the case here as well. *See* [287-15] ¶ 151 (respondents were asked "why do you say that" after they identified another manufacturer or brand who they believed had sponsored the product depicted); *id.* ¶ 237 (respondents were asked "what makes you say that" after they identified a particular company or brand that they associated with the appearance of the pump

or collector).[3]

Nor is it clear that including a weak control stimulus (even assuming that is a fair characterization of the control stimuli used here) renders a survey "so flawed as to be completely unhelpful to the trier of fact" and therefore inadmissible. *See AHP*, 1 F.3d at 618; *see also LG Elecs.,* 661 F. Supp. 2d at 956 (criticisms alleging an improper control group in a consumer confusion survey "address[] the weight of the [survey], rather than its admissibility").[4]

Though Medela's expert may disagree with the strength of Harper's control stimuli, [303] at 4, ultimately, this type of "battle of the experts" is inappropriate for

---

[3] To support Harper's exclusion, Medela relies on a post-trial ruling in *Black & Decker*, in which the district court concluded that a new trial was warranted due to the improper admission of likelihood of confusion survey. [330] at 2 (citing *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2017 WL 4010922 (N.D. Ill. Sep. 11, 2017)). Medela fails to acknowledge, however, that the district court in *Black & Decker* granted the post-trial motion, in large part, because the expert's trial testimony deviated significantly from the expert report that had survived the pre-trial *Daubert* challenge. *See Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2017 WL 4010922, at *3 ("Despite offering the survey as evidence that Defendants' trade dress caused customer confusion, however, Mr. Berger testified at trial that his survey did not test causation, but instead was merely 'observational.'"); *id.* ("According to Mr. Berger, the survey was not concerned with whether Defendants' trade dress caused the consumers' confusion."); *id.* at *5 ("Although Mr. Berger testified that the photo was 'of a store environment,' … Plaintiffs were unable to authenticate the photo on which the survey was based."). There is no suggestion at this juncture that Harper's survey is not being offered as evidence of consumer confusion, so Medela's reliance on the 2017 decision in *Black & Decker* is suspect.

[4] Medela points to secondary literature to support its argument that Harper's selection of improper control stimuli renders her report inadmissible. [330] at 8 (citing Shari S. Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys*, (2d ed.) at 86, 99). But its source material mandates no such outcome. If anything, Diamond and Swann recognize the inherent difficulty in devising proper control stimuli, which is consistent with courts' general conclusion that criticisms of selected stimuli bear on the weight to be given an expert's analysis, not its admissibility. *See, e.g., id.* at 99 (recognizing that "proper interpretation or application" of the principle that "a proper control stimulus is identical to the test stimulus in all respects except the specific element to tested" "is more challenging than it sometimes appears"); *id.* at 100 ("[A]s the test element in a secondary meaning survey becomes more inherently complex, so does choice of an appropriate control.").

resolution in a *Daubert* motion. *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008) ("[I]n a case of dueling experts ... it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony."). Medela may test Harper's potentially weak control stimuli through cross examination, so that the jury might determine the "weight to be accorded to the survey results." *McGraw-Edison*, 787 F.2d at 1172. But Medela's bones of contention provides no basis to strike Harper's testimony altogether.

***Point-of-Sale Confusion Survey and Marketplace Reflection***: Medela separately complains that Harper's point-of-sale confusion survey did not reflect how consumers encounter the depicted pumps in the real-world marketplace. [303] at 8–10. It argues that the pictures Harper used did not "present[] the full scope of information available to a prospective online purchaser" and are "devoid of a host of further identifying information that consumers would typically encounter by viewing the actual product listing page for these products." *Id.* at 9.

As pictured above, *see supra* at 8, the point-of-sale confusion survey included an image of Medela's pump, captured from a buybuybaby.com listing, featuring the "MEDELA" brand name; the product's name, Medela® Silicone Breast Milk Collector; its price; and an image of the pump that included its lanyard and yellow stopper. [287-15] ¶ 140. Medela suggests that Harper should have used the "full product listing," including images of the pump's packaging, additional images of Medela's "signature butter yellow," a bullet point list of the pump's features, and the ability to

click on the pump's image to expand it. [303] at 9. Medela offers similar critiques of Harper's presentation of the Elvie wearable pump. *Id.*

Medela cites two cases to support its proposition that the survey's alleged "failure to reflect actual marketplace conditions provides grounds for inadmissibility." *Id.* at 10. The first, *THOIP v. Walt Disney,* advises that a failure to reasonably approximate actual marketplace conditions may provide grounds for inadmissibility and that the closer a survey comes to mirroring "the situation in which the ordinary person would encounter the [product], the greater the evidentiary weight of the survey results." 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010). In *THOIP*, the district court concluded that an expert had failed to reasonably approximate actual marketplace conditions by designing a survey premised on the unsupported notion that consumers would encounter the specific products tested by the survey in close proximity to one another, *id.* at 236–38, and where "[t]he shirts used in the survey did not bear the neck labels and hang tags that would have been attached to the shirts in the marketplace," *id.* at 238–39. Although Medela tries to analogize the absentee information in Harper's point-of-sale survey to the flaws in *THOIP*, they are not of similar ilk. The flaws in *THOIP* bore on a core component of a consumer's shopping experience (whether the competing products could be found in the same location) and deprived consumers of source information that likely would have diminished confusion. *Id.* By comparison, the omissions about which Medela complains are far more ancillary, and they largely involve source information that is

13

cumulative of source information already visible on the images shown as part of Harper's survey.

In the second case Medela cites, *American Footwear Corp. v. General Footwear Co. Ltd.,* survey participants at six different shopping centers were shown a poster of a boot that did not include the boot's brand name. 609 F.2d 655, 660 n.4 (2d Cir. 1979). The poster was not intended for such isolated display, but rather for display at shoe fair and industry trade show booths, "in an environment replete with references to [the brand] as the seller of the boot." *Id.* The Second Circuit found the district court's rejection of this survey not clearly erroneous, in part because the poster was shown to participants entirely isolated from its intended context. That conclusion is not relevant here, where Harper's survey included two references each to the Medela and Elvie brand names, along with other identifying information. [287-15] ¶¶ 140, 145. Harper's omission of *all* of the identifying features that Medela would have preferred is not a reason to exclude the survey, but fodder for cross examination.

Fundamentally, as Think Green points out, a survey need "not replicate the exact purchasing experience of every consumer confronting [the pertinent product] in the marketplace"; it requires only "reasonable choices based on [the expert's] experience and training and on accepted survey techniques." *See Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 571 F. Supp. 3d 185, 209 (S.D.N.Y. 2021); *see also Maui Jim, Inc. v. SmartBuy Guru Enters.*, No. 1:16 CV 9788, 2019 WL 5577165, at *4 (N.D. Ill. Oct. 29, 2019) (although "[s]urveys should replicate the marketplace conditions as well as possible," "[n]o control is perfect, so reliability does not require exact

simulation of the situation at issue").[5] Ultimately, in this Court's estimation, Medela's criticisms do not bear on the survey's admissibility, but the "evidentiary weight of the survey results"—a question for the jury. *THOIP*, 690 F. Supp. 2d at 231.

***Control Stimulus in Post-Sale Confusion Survey:*** Through a different survey, Harper sought to "determine whether Medela's breast milk pump/collector is likely to cause post-sale confusion." *Id.* ¶ 171. Post-sale confusion occurs when a potential customer sees a product bearing the plaintiff's trade dress and mistakenly attributes the product to the plaintiff, thereby influencing his or her buying decision, either positively or negatively. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 683 (7th Cir. 2001); *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872–73 (2d Cir. 1986) ("[P]ost-sale confusion would involve consumers seeing

---

[5] Medela cites to earlier language in *Maui Jim*, in which the district court wrote as follows: "A survey control that involves changing multiple relevant components does not effectively serve this function." No. 1:16 CV 9788, 2019 WL 5577165, at *3; [330] at 2. Medela omits, however, the conclusion of the district court's analysis, which—consistent with the language from *Maui Jim* that the Court cites in the body of this opinion—reads as follows: "Nevertheless, 'while the fact that a survey used a control that could have been "stronger" or "better" may mean it is entitled to less weight, it does not mean that the survey does not provide relevant information.'" *Id.* (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 740 (S.D.N.Y. 2011)). This is not the only instance of selective citations the Court has encountered in Medela's briefs. As another example, Medela attempts to take Think Green to task for selectively quoting from *Western Publishing Co., Inc. v. Publications Intl, Ltd.*, No. 94 C 6803, 1995 WL 1684082 (N.D. Ill. May 2, 1995). [330] at 2–3. The Court has reviewed *Western Publishing* and does not agree with Medela's characterization of Think Green's reliance on that decision for specific, articulated purposes. [319] at 2–4, nn. 10, 17 & 24. Medela, on the other hand, argues that *Western Publishing* supports excluding Harper's report altogether. [330] at 2–3. But *Western Publishing* did no such thing. In granting plaintiff's motion for a preliminary injunction, the court in *Western Publishing* made clear that its critiques of the plaintiff's expert's report bore only on the weight it would give it. *Id.* at *15 ("[T]his court accords very little weight to the results of the survey performed by Marketeam for Western."); *id.* at *16 ("The parties' survey evidence was disappointing and entitled to little weight."); *id.* ("[U]se of a control would be enlightening. Nevertheless, this evidence that consumers are confused as to the source of origin of Little Rainbow Books cannot be completely discounted.").

[plaintiff's] jeans outside of the retail store, perhaps being worn by a passer-by. The confusion the [Lanham] Act seeks to prevent … is that a consumer seeing the familiar stitching pattern will associate the jeans with [defendant] and that association will influence his buying decisions.").

To assess the likelihood of post-sale confusion, Harper's online survey first screened for respondents who purchased a pump in the last year or who would consider purchasing one in the next year. [287-15] ¶ 181. The test group was presented with four images of Medela's pump, collected from Medela's online retail product pages, less Medela's name, design elements, and measurements. *Id.* ¶ 184. Those images are as follows:



*Id.*

The control group was presented with four images of a different pump (again, the Elvie Curve) that did not share Medela or Think Green's trade dress. *Id.* ¶ 190. Those images are as follows:



*Id.*

Respondents were invited to click on the images to enlarge them and could only proceed with the survey if they affirmed that they "viewed the breast milk pump/collector clearly." *Id.* ¶¶ 191–92. Respondents were ultimately asked what company, companies, or brand(s) they believed put out the pictured pump, assuming they had an opinion in that regard; why they had that belief; and whether they believed the pump was affiliated with, or sponsored or approved by, any other company or brand. *Id.*

Medela lodges two primary objections to this survey. The first is with the images Harper presented to the test group of its pump. *Id.* ¶ 184. Medela describes these images as "small thumbnail[s]" with "various elements" that obscured the Medela product, such that the respondents were unable to see the elements that

purportedly infringe upon Think Green's trade dress. [303] at 6. But as Think Green points out, Medela ignores the survey's instructions permitting respondents to enlarge the images by clicking on them and prohibiting respondents from proceeding with the survey if they did not get a clear picture of the pump. [319] at 7. And in any event, whether a survey's images are too small or otherwise unclear is an objection for a jury to hear, not a basis for excluding survey results altogether. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 508 (S.D.N.Y. 2015) (rejecting argument that survey experts should be excluded because control was not visible where "the screen contained instructions to click to enlarge … and to stay in the study, respondents had to affirm that they could see the sunglasses"); *Active Sports Lifestyle USA LLC v. Old Navy, LLC,* No. SACV1200572JVSEX, 2013 WL 11239385, at *15 (C.D. Cal. Nov. 21, 2013) (where the "survey took steps to ensure the depictions were accurately presented, including eliminating from the survey any consumer who tried to complete the survey from a small smart phone display," whether images shown in a survey were too small or illegible was subject for cross-examination).

Medela's second objection lies with the control stimuli images. [287-15] ¶ 190. Medela argues that the wearable pump shown to the control group is so "drastically different" from Think Green's trade dress that it is invalid as a control. [303] at 6–7. Pointing in particular to a pump manufactured by competitor Lansinoh, Medela argues that this pump would have been a stronger or better control stimulus. *Id.* at 7. But Medela concedes that the selected control stimulus "fall[s] broadly under an

umbrella of breastfeeding pumps." *Id.*; *see also* [287-15] ¶ 143. In addition, as Harper points out in her report, the control stimulus has some non-infringing similarities to Think Green's product: "they are both made of silicone, both clear and white in color, and both with curves." *See* [287-15] ¶ 142. It is also not *too* similar to Think Green's trade dress, *id.* ¶¶ 142, 146, a scenario that could present a different problem. *See Am. Nat'l Ins. Co. v. Am. Nat'l Inv. Advisors, LLC*, No. 11-CV-4016, 2014 WL 6613342, at *17 (N.D. Ill. Nov. 21, 2014) (a control that "shares the very characteristic whose influence is being assessed … does nothing to eliminate background noise from the survey and undermines the survey's probative value"). Although Medela criticizes Harper for not using as a control stimulus one of the 10 "bottle-type one-piece silicone breast milk collectors" identified in her report, [287-15] ¶ 73, each of those products has a pear- or round-shaped collector, similar to Think Green's product. Further, and more to point: whether a *better* control stimulus existed, and whether Harper could or should have presented that other control stimulus, is an inadequacy that bears on the weight of the evidence and can be explored on cross-examination. *See AHP*, 1 F.3d at 618; *LG Elecs.*, 661 F. Supp. 2d at 956; *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1037–38 (9th Cir. 2010).

In support of its argument, Medela points to a number of cases in a lengthy and perfunctory string citation, but nearly all are word mark (not trade dress) cases,

and none require a survey's exclusion should the survey fail to use the *best* available control stimuli.[6] [303] at 8.

**Test Stimuli in Post-Sale Confusion Survey**: Medela next criticizes the post-sale confusion survey's test stimuli as failing to "reflect real-world conditions in which consumers are likely to encounter the products." *Id.* at 14. This argument is difficult to discern. The post-sale confusion survey test stimuli is a compilation of four photographs, pictured above at page 16, which show a woman using the pump while breastfeeding, washing the pump, storing it in a purse, and pouring milk from it. [287-15] ¶ 184. These are typical uses of a pump. Medela offers no further

---

[6] *mySimon* largely concerned the uses of the name "Simon" in a web address and the expert's failure to include a control group that also used the name "Simon" in its web address. 104 F. Supp. 2d at 1045–46; *see also id.* (explaining that this omission failed to account for "the fact that the name 'Simon' is used extensively on the Internet for commercial purposes" and that "[t]hose many other uses clearly do not infringe plaintiff's trademark rights"). Medela does not link the reasoning in *Simon* to its argument here. In *Reed-Union Corp. v. Turtle Wax, Inc.,* 869 F. Supp. 1304, 1311 (N.D. Ill. 1994), *aff'd*, 77 F.3d 909 (7th Cir. 1996), the control stimulus (a bottle of car wax) was found to be improper because it was prominently emblazoned with a brand name, while the brand name on the test stimulus was printed in small lettering, on the back of the bottle. As the court in *Reed* explained: the "control product could not measure inherent confusion in the marketplace because it prominently identified the maker." *Id.* Medela does not make that argument here. *ConAgra, Inc. v. George A. Hormel & Co.* was neither a summary judgment order nor a *Daubert* analysis, but a magistrate judge's findings pursuant to a bench trial. 784 F. Supp. 700, 730 (D. Neb. 1992). In these findings, though the magistrate judge critiqued the survey's control group, he specified that "[t]his of course does not mean the Kaplan study is irrelevant." *Id.* In *Cumberland Packing Corp. v. Monsanto Co.,* which concerned allegedly infringing packaging, the court determined that the survey was unreliable in part because "the two most common reasons people gave for" confusing the packaging were irrelevant to the claimed trade dress. 32 F. Supp. 2d 561, 574–75 (E.D.N.Y. 1999). *Cumberland* explained that "appropriate controls should have been designed to net out confusion based on these two variables," *id.* at 575, but Medela does not make an argument premised on the survey responses here. The Court is similarly unpersuaded by Medela's reliance on *National Football League Properties, Inc. v. ProStyle, Inc.,* 57 F. Supp. 2d 665 (E.D. Wis. 1999). [303] at 2. There, survey results were inadmissible because "[t]he main problem with the survey … is that it essentially asks only one question, 'What, if anything, do you think of when you see this shirt?', without further probing … and without showing any 'control' shirt to any survey respondents or asking any control questions." *Id.* at 668. As already explained, those are not flaws in Harper's survey.

explanation as to why these images fail to "reflect real-world instances in which a substantial portion of consumers have the possibility of encountering these products." [303] at 14.

Medela vaguely alludes to the "obvious intimate and exposed nature of using a collector" as a reason that the images utilized are "unlikely." *Id.* at 14–15 (citing a 1994 out-of-district case concerning the "inherently concealed nature of worn underwear"); *see also* [330] at 14 (arguing that only "some vanishingly small number of those privy to these private moments" would actually witness the parties' products in use). But a woman (or man) washing or storing a pump is not the same as an individual exposing one's underwear. Nor is the act of pouring breast milk from a pump into a bottle. (Is the act of pouring baby formula into a bottle similarly "intimate"?) Even the act of using a pump is not so inherently "intimate" that a consumer would be unlikely to have encountered someone using one. That is particularly true when the consumer in question either purchased a pump in the last year or is considering purchasing one in the coming year, as the consumers in this survey said they did or were. As Medela well knows, pumps are not just used in small, darkened rooms. In homes, they are openly used in communal living spaces. In office settings, they may need to be used in shared lactation rooms. Resourceful women also use them on airplanes, in locker rooms and the lounge areas of public bathrooms, at parks, and on playdates—truly, the list goes on and on.[7]

---

[7] This type of flexibility and ingenuity is critical given how long U.S. infants are typically breastfed. As Harper notes (in a portion of her report that Medela does not challenge), about 60% of infants are breastfed at the six-month mark and 35% at the one-year mark. [287-15] ¶ 34.

What images Harper should have presented to better represent the "obvious intimate and exposed" nature of using a breast pump, Medela does not say. In any event, whatever Medela's argument, it affects the weight of the evidence—not its admissibility.

***Test Stimulus in Secondary Meaning Survey:*** Medela argues that the test stimulus Harper used in her secondary meaning survey was "fundamentally flawed" because it failed to isolate the trade dress. [303] at 10–11. It points to the inclusion of the "distinctive ridge around the breast shield" visible in the test stimulus, as depicted immediately below, even though Think Green disclaimed this ridge in its trade dress. *Id.* at 11.



To support its assertion that "a secondary meaning test stimulus must isolate the trade dress at issue," Medela cites *Handelman's Guide to TTAB Practice, Second*

*Edition,* § 18.15. *Id.*[8] But the quoted portion of *Handelman's Guide* specifically directs that "[i]f the image used in the stimulus differs from the mark shown in the application or registration drawing"—as Medela alleges here—"the difference will weigh against the probative value, if any, to be accorded to the survey." *Id.* In other words, Medela's own source instructs that the weight to be assigned to the secondary meaning survey is a question for the jury—not one of admissibility.

**_Use of Functional Stimuli To Assess Non-Functional Trade Dress:_** Medela next argues that Harper's surveys did not test the asserted trade dress, because the "shield-bulb-base" arrangement featured in the stimuli is functional. [303] at 11; *id.* at 12 ("Because Ms. Harper's opinions on secondary meaning rely upon a design that Plaintiff has not established is non-functional, her evidence is irrelevant."). This argument mirrors a central theory of Medela's summary judgment motion: that Think Green's asserted trade dress is functional and therefore cannot be protected. *See generally* [287]. The Court will address this argument when it resolves Medela's motion for summary judgment.

---

[8] Medela also cites to "*THOIP, supra.*" [303] at 10. The Court assumes that Medela is referring to *THOIP,* 690 F. Supp. 2d at 231, which it cited just above this passage. *See* [303] at 10. However, page 231 of *THOIP* discusses survey methodology generally, and does not appear directly relevant to Medela's argument as to the adequacy of a secondary meaning test stimulus. Medela may also be referring to page 240 of *THOIP*, which it cited earlier in its brief. *See* [303] at 3 (quoting *THOIP's* direction that "a control should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." 690 F. Supp. 2d at 240 (cleaned up)). But this passage of *THOIP* does not support Medela's argument that "a secondary meaning test stimulus must isolate the trade dress at issue": rather, it directs quite conversely that a *control* stimulus must contain the key *unprotectable* elements of the test stimulus. *Id.*

23

***Net Secondary Meaning Calculation:*** Medela argues that Harper's secondary meaning calculation is "fundamentally flawed" because, in calculating net secondary meaning, she failed to subtract a particular number from the results—which differs from the methodological choice made by Medela's expert, Botner. [303] at 13. Harper, however, has laid out her reasons for employing the methodology that she did and, in so doing, amply conveys that her calculations were a considered choice, not the result of fatal error or oversight. *See generally* [287-15] ¶¶ 240–44; [315–20].[9]

At the end of the day, the two experts analyzed the same data, but came to different conclusions about its meaning. That leaves the Court with a "battle of the experts" situation that is inappropriate for dispensation in a *Daubert* motion and must be left for the factfinder to resolve. *See Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) ("Although those professionals were commenting largely on the same body of evidence relating to [plaintiff's] course of treatment, they came to directly contradictory conclusions as to what that evidence revealed …. So the case … presented a classic battle of the experts."); *In re Dealer Mgmt. Sys. Antitrust Litig.,* 581 F. Supp. 3d 1029, 1057 (N.D. Ill. 2022) ("Both parties' opinions are based on data, which can be interpreted in different ways. It is up to the factfinder to evaluate the quality and relative persuasiveness of that data."); *Godinez v. City of Chicago*, No. 16 CV 7344, 2019 WL 5290900, at *3 (N.D. Ill. Oct. 18, 2019) ("That Defendants' experts disagree with Dr. Leestma's interpretation of the data goes to the weight of Dr.

---

[9] The Court addresses Medela's efforts to strike Harper's rebuttal declaration later in this opinion.

24

Leestma's opinion, not its admissibility.") (citing *Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013)).

***Data Supporting Secondary Meaning Opinion:*** Medela argues that Harper's report "fails to substantiate the connection between *these data points* with [its] conclusions that these were purportedly successful in connecting Think Green as the source of the trade dress in the minds of relevant consumers." [303] at 13–14 (emphasis added). By "these data points," Medela appears to be referencing the entire universe of "sales data, advertising expenditures, awards, social media followers, [etc.] [sic]" in Harper's report. *Id.* at 13. But Medela does not actually cite to "these data points" or describe them with any degree of specificity. The Court will not guess at them, nor will it develop Medela's argument for it. *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) ("[S]ummary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it was not the district court's job to sift through the record and make Connors's case for him.").

### 3. Admissibility of Harper's Rebuttal Declaration

Think Green attaches a rebuttal declaration from Harper to its response to Medela's motion for summary judgment in which Harper responds to Medela's criticism of her net secondary meaning calculation. [315-20]. Medela moves under Rule 37 of the Federal Rules of Civil Procedure to strike this declaration. [331]. Focusing heavily on one paragraph of the declaration, [315-20] ¶ 13,[10] Medela argues

---

[10] Harper's rebuttal has two paragraphs labeled ¶ 13. For purposes of this discussion, the Court will use ¶ 13 to refer to the first of the two so labeled paragraphs.

that the declaration comes too late[11] and represents an improper effort to supplement the experts' original disclosures of opinions as required under Rule 26(a)(2).

Rule 26(a)(2)(B) mandates that expert reports "contain a complete statement of all opinions to be expressed and the basis and reasons therefor." Rule 37 provides in relevant part that a party may not rely on evidence that was not disclosed in violation of Rule 26, unless that party has either a substantial justification or the information is harmless. But "[w]hile Rule 26 demands that expert disclosures be 'complete,' there is no requirement that such disclosures cover any and every objection or criticism of which an opposing party might conceivably complain." *Allgood v. Gen. Motors Corp.,* No. 102CV1077DFHTAB, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006).

For example, as then-District Judge Hamilton explained in *Allgood,* "an expert need not stand mute in response to an opposing party's *Daubert* motion. Otherwise, if the expert needed to anticipate and rebut every possible criticism, expert witness practice would become even more expensive and unwieldy." *Id.* Rebuttal declarations that respond to an opposing party's specific criticisms or harmlessly repeat earlier-provided information do not violate Rules 26 or 37. *Id.*; *see also Elorac, Inc. v. Sanofi-Aventis Can., Inc.,* No. 14C1859, 2016 WL 11942749, at *1 (N.D. Ill. Oct. 4, 2016) (an expert's report that "addresses criticisms he has not yet had an opportunity to address" and is "firmly grounded in the opinions disclosed in his expert report and

---

[11] The parties' scheduling order did not impose a deadline for reply reports. [206]. Expert discovery closed on May 20, 2024. [257]. Think Green filed Harper's rebuttal declaration along with its response in opposition to Medela's motion for summary judgment on October 11, 2024. *See* [315-20].

serves merely to clarify them" is not a supplemental report and does not violate Rules 26 or 37); *GC2 Inc. v. Int'l Game Tech.,* No. 16 C 8794, 2019 WL 12528940, at *2 (N.D. Ill. Jan. 16, 2019) (a rebuttal declaration that "reaffirm[ed] an earlier critique … does not run afoul of Rules 26 or 37").

In her short rebuttal declaration, Harper responds to what she describes as "mischaracterization" and criticism Medela offered in its summary judgment briefing. [345] at 3–4 (citing [282] ¶ 50; [315-20]). More specifically: Harper explains that there are multiple ways of calculating net secondary meaning and why she chose her particular method of calculation. [315-20] ¶¶ 6–11. At the conclusion of her rebuttal, Harper performs an alternate method of calculation that "[s]ome sources indicate [is] also appropriate," which she claims—consistent with her previously expressed opinion—"shows that the trade dress is strong." *Id.* ¶ 13.

Harper's rebuttal declaration remains "firmly grounded" in the opinions she expressed in her original expert report. *Allgood,* No. 102CV1077DFHTAB, 2006 WL 2669337, at *5. It is not a "[n]ever mind," a "do-over," or a "disavow[al]." *Contra* [331] at 3, 5. The only arguably new opinion that Harper provides in rebuttal is limited to Paragraph 13, in which she sets forth an alternative calculation method that leads to the same conclusion as her original report. Because this is the type of responsive report that is permitted under Rules 26 and 37, the Court denies Medela's motion to strike Harper's rebuttal declaration.

## B. Cynthia Cohen

Cynthia Cohen, who Medela proffers as an expert in areas related to psychology and consumer research, reached the following conclusion based on her analytical work: "offering the Medela breast milk collector on the Amazon platform does NOT cause consumer confusion." [294-2] at 29. Think Green moves to strike this conclusion and the entirety of Cohen's expert report pursuant to Rule 702 and *Daubert,* 509 U.S. at 579. *See generally* [292]. For the reasons that follow, the Court denies Think Green's motion.

### 1. Admission of Expert Testimony, Generally

Like survey evidence, the admission of expert testimony more generally is governed by Rule 702 and the principles outlined in *Daubert*, 509 U.S. at 579. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides that expert testimony is admissible if:

> the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Put another way, the Court "must engage in a three-step analysis before admitting expert testimony." *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). "It must determine whether the witness is qualified; whether the

expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.*

Think Green challenges the admissibility of Cohen's expert report on all three grounds: qualifications, reliability, and relevance. The Court addresses each in turn.

### 2. Cohen's Qualifications

Under Rule 702, an expert is qualified "by knowledge, skill, experience, training or education." Fed. R. Evid. 702. "This is a liberal standard; the expert need only have some specialized knowledge that would assist the trier of fact." *Africano v. Atrium Med. Corp.,* 561 F. Supp. 3d 772, 776 (N.D. Ill. 2021) (cleaned up).

Establishing whether a witness is qualified as an expert "can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Specifically, courts "must look at each of the conclusions [the expert] draws individually to see if [s]he has the adequate education, skill, and training to reach them." *Hall* v. *Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Courts may "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

The parties seem to agree that Cohen's proffered conclusion and underlying analysis concerns the likelihood of confusion in trade dress cases. [293] at 2; [320] at

2. The next question is whether Cohen has "adequate education, skill, and training" to support her expert opinions. *Hall,* 840 F.3d at 926. Medela argues that she does, citing her publications, speeches, and court appearances as an expert witness concerning consumer surveys.[12] [320] at 3. It further argues that Cohen's experience conducting consumer surveys related to trademark disputes is relevant to trade dress disputes, as the methodology between the two topics is largely interchangeable. [320] at 4.

For its part, Think Green argues that Cohen is not an expert on trade-dress likelihood of confusion because she:

- lacks relevant marketing training, education, or experience, "that is essential for a likelihood of confusion analysis," [293] at 5;

- has never testified in court before a trier of fact, *id.* at 6;

- cannot recall being present for a court's ruling on her qualifications, *id.*;

- has never been qualified to testify as a likelihood of confusion or survey-design expert prior before the preliminary injunction hearing in this matter, *id.,* and

- had not yet conducted any likelihood of confusion surveys before 2021, when Think Green filed its complaint, *id.*

There is a prevailing theme across several of these criticisms: that Cohen's limited prior experience as an expert or witness renders her unqualified. The Court affords

---

[12] First, though, Medela points out that the court previously assigned to this matter twice denied Think Green's motions to strike Cohen's testimony. [320] at 1, 2. Yet in neither denial did the previous court assess Cohen's qualification. *See generally* [96]; [185]. Indeed, the first denial took place in the context of a preliminary injunction hearing, where there was no jury, so there was no real gate-keeping function for a court to play. *See City of Evanston v. N. Illinois Gas Co.,* 381 F. Supp. 3d 941, 948–49 (N.D. Ill. 2019).

no weight to these criticisms as "there is a first time in court for every expert." *United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005).

With respect to Think Green's remaining critiques of Cohen's qualifications: Think Green concedes that Cohen has at least twice previously opined on likelihood of confusion in trademark cases, designed and implemented "a handful of trademark surveys," and received praise for conducting a "consumer attitudes" survey for the International Trademark Association. [323] at 6–7. It argues, however, that because trademarks are so different from trade dress and because "consumer attitude" surveys are so different from "likelihood of confusion" surveys, Cohen is not qualified to opine on matters of likelihood of confusion in a trade dress case. *Id.* at 7. Ordinarily, however, courts do not require that an expert be a specialist in a given field. *Hall*, 840 F.3d at 929 (quoting *Gayton*, 593 F.3d at 617). Rather, that an expert does not specialize in a certain field goes to the weight of the opinion—not its admissibility. *See Africano,* 561 F. Supp. 3d at 777; *Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.,* 379 F. Supp. 3d 687, 700 (N.D. Ill. 2019) ("[W]hile experts' lack of specialization in a specific subfield or technology may affect the *weight* of the opinions they express, it does not preclude the *admissibility* of those opinions."); *Prayitno v. Nextep Funding LLC,* No. 17 C 4310, 2019 WL 6497374, at *6 (N.D. Ill. Dec. 3, 2019) ("It is clear that Mr. Forster possesses certain specialized knowledge that may assist the trier of fact, and to the extent that plaintiff argues that it is not narrowly specialized enough in the relevant field to point to the correct conclusion, the way to test his expertise is not at the threshold in a *Daubert* motion, but at trial though

31

opposing evidence or cross-examination."). In a similar vein, "shaky" expert testimony still may be admissible, "assailable by its opponents through cross-examination at trial." *Gayton,* 593 F.3d at 616.

Applying these principles to the circumstances here: "A consumer behavioral expert is not so irrelevant as to be unqualified to testify to help the jury determine whether there exists likelihood of confusion, secondary meaning, or functionality." *Bobcar Media, LLc v. Aardvark Even Logistics, Inc.,* 554 F. Supp. 3d 606, 612 (S.D.N.Y. 2020). And Think Green "provides no support for its argument that consumer survey research in trade dress litigation is *sui generis* such that an expert's lack of experience in designing these specific surveys necessarily disqualifies h[er] from giving an expert opinion." *Belk, Inc. v. Meyer Corp.,* 679 F.3d 146, 162 (4th Cir. 2012). Think Green tries to distinguish *Belk* by arguing that the appeals court there "credited the expert with having been qualified as an expert witness in consumer behavior and marketing in about 20 cases throughout his career" and further noted "that much of the expert's previous consulting projects included creating, designing, and evaluating consumer surveys and interpreting consumer research." [293] at 5 (discussing *Belk*). But as Medela points out, Cohen shares similar credentials. She has been recognized by the International Trademark Association for her work developing a tool "measuring consumer attitudes towards brands, counterfeits, brand enforcement, and the ways consumers view the media"; she has served as a consumer survey expert in at least 14 federal cases; and she is an author and invited speaker on topic of consumer surveys. [320] at 1–4.

As another district court has persuasively reasoned, the "expertise most germane" to a "determination of whether a particular trademark or trade dress as acquired a secondary meaning … involves training or experience performing empirical analyses." *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,* 209 F. Supp. 3d 612, 639 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017). By this measure, Think Green effectively has conceded Cohen's qualifications. In Think Green's own words, Cohen has acted as a "survey expert in a number of cases"; is an "expert in … community attitude surveys, gender surveys, and attorney perception surveys"; has performed a "handful of trademark surveys"; and testified twice on her opinions related to trademark likelihood of confusion surveys. [293] at 5; [323] at 6.[13]

Nor does Think Green explain its fixation on Cohen's lack of expertise in marketing consumer products. Although Think Green criticizes Cohen for not having "essential" experience, education, or training in marketing, it does not draw any link between "a professional marketing background" and trade dress likelihood of

---

[13] Think Green cites *Radiance Foundation, Inc. v. National Association for the Advancement of Colored People* as supportive of the contention that "general expertise in the area of surveys and marketing is not sufficiently specialized to assist in deciding" on issues of trademark dilution and likelihood of confusion. 27 F. Supp. 3d 671, 675 (E.D. Va. 2013). However, as Medela points out, the expert witness in *Radiance Foundation* was permitted to testify concerning principles and methodologies of consumer surveys, but could not testify as to trademark matters, because she was unfamiliar with basic trademark law concepts. *Id.* at 675–677. For example, that expert misunderstood concepts of trademark dilution and consumer confusion in her deposition and admitted to her unfamiliarity with trademark law and consumer surveys used to test dilution and confusion in trademark litigation. *Id.* at 676. She also admitted to having Googled issues after filing her report, but before her deposition. *Id.* Here, Cohen is indisputably familiar with trademark law concepts, and Think Green cites no instances of her unfamiliarity with trade dress concepts.

confusion surveys. [293] at 5; [323] at 7. The Court is not persuaded that an expert who lacks a marketing degree or marketing experience should be automatically precluded from opining on matters of trade dress: "The notion that *Daubert* … requires particular credentials for an expert witness is radically unsound … Anyone with relevant expertise enabling h[er] to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir. 2000).

For these reasons, the Court rejects Think Green's invitation to exclude Cohen's expert testimony on likelihood of confusion based on her qualifications.

### 3. Reliability of Cohen's Methodology

As explained earlier, the Court must ensure that an expert's testimony is "the product of reliable principles and methods; and … reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The question of reliability requires an assessment of the "validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc.* v. *Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

Think Green argues that Cohen's likelihood of confusion survey relied on improper methodology. In Cohen's survey, respondents were shown the stimulus image of Medela's pump "as it had been displayed on the Amazon platform." [294-2] at 9. With the stimulus picture still available on the screen, respondents were asked open-ended questions meant to assess whether confusion was likely. *Id.* For example, respondents were asked "if you have an opinion, what company or organization

34

makes or puts out this breast milk collector" and if the respondent had an opinion, whether the respondent "believe[d] that this breast milk collector is affiliated with or sponsored by any other company." *Id.*

Think Green takes issue with Cohen's methodology of showing respondents the stimulus picture *while* the respondents answered the survey questions. According to Think Green, this is "a major flaw" that "departs from typical marketplace conditions." [293] at 8. To support its argument, Think Green cites secondary source literature describing the concept of "demand effects," which "are produced when respondents use cues provided by the survey procedures and questions to figure out the purpose of the survey and to identify the 'correct' answers to the questions they are asked." *Id.* at 9 (quoting Ran Kivetz & Itamar Simonson, *Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS 243 (2012)). Think Green contends that presenting a respondent with a stimulus and a question simultaneously impermissibly creates "demand effects" by "placing an undue focus on the branding included with a product listing." *Id.* But Think Green does not explain—at least not to a degree that the Court finds persuasive—how a survey that displays the stimulus and questions at the same time produces such "demand effects,"

but one that displays the stimulus and questions on pages viewed sequentially (but realistically, still within a short very timeframe) does not.[14]

For its part, Medela points to a series of cases and secondary sources concluding that presenting the stimulus while the respondent answers the survey is "in accordance with well-established survey methodology." [320] at 6–7. It also explains—credibly, in this Court's view—that because "[a] consumer would be staring directly at the product, together with its packaging and description, at the moment he/she made the decision to purchase (e.g., clicked 'Add to Cart')," the methodology underlying Cohen's survey sufficiently mimics marketplace conditions. *Id.* (citing *Cumberland Packing*, 32 F. Supp. 2d at 578).

In its reply brief, Think Green counters that leaving the stimulus image on the screen is not actually reflective of typical marketplace conditions because when Amazon shoppers add an item to their "cart," the product image disappears, "leaving a mere thumbnail without the same brand-identifying textual content." [323] at 1. This argument—which was absent from Think Green's opening brief—comes too late. "[R]eply briefs are for replying," not raising new arguments. *United States Sec. & Exch. Comm'n v. Benger,* 64 F. Supp. 3d 1136, 1140 (N.D. Ill. 2014); *United States v.*

---

[14] To support this point, Think Green cites one case's criticism of "survey[s] that use[] stimuli that differ from what a consumer is actually likely to see in the marketplace" as lacking probative value. *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.,* No. 06 CIV 550 JFK, 2007 WL 2258688, at *10 (S.D.N.Y. Aug. 6, 2007). However, its argument—which concerns the appearance of stimuli simultaneously with survey questions—does not appear related to *Kargo*, which criticized a survey for asking respondents about an "ad" for plaintiff's product when the "ad" was actually "a page prepared by [plaintiff] as promotional material, designed for viewing by [plaintiff's] direct, business-to-business customers," rather than designed for viewing by end users. *Id.* at *11.

*Kennedy,* 726 F.3d 968, 974 n. 3 (7th Cir. 2013). Think Green's argument is also perplexing. Even a thumbnail image of a Medela product still sports the Medela logo on the product itself and accompanying box. [323-1] ¶ 4. Moreover, to the extent the thumbnail image differs from what the consumer can see on the preceding page, Think Green's argument suggests that because a likelihood of confusion survey must replicate market conditions, it must replicate them *exactly*. This would seemingly turn "likelihood of confusion" surveys into a memory game. *See Simon Prop. Grp. L.P.,* 104 F. Supp. 2d at 1043 ("They make the proposed survey nothing more than a meaningless memory game or word association exercise that bears no relationship to the marketplace.").

As the Court already explained when denying Medela's motion to exclude Harper's expert report, no survey is "foolproof," and perfection is not required to clear the *Daubert* bar. *AHP*, 1 F.3d at 618. Think Green has presented no argument that any flaws in Cohen's survey create one of the "rare" situations where a survey is so fundamentally flawed "as to be completely unhelpful to the trier of fact and therefor inadmissible." *AHP,* 1 F.3d at 618. The arguments it raises concerning the respondents' reliance upon the text in the stimulus image are appropriate for cross examination. [323] at 2–3.

### 4. Relevance of Cohen's Testimony

Like Harper's testimony, Cohen's survey evidence concerning likelihood of confusion will assist the jury in evaluating Think Green's claim of trade dress infringement. Think Green's only arguments to the contrary are based on Cohen's

qualifications and the reliability of her methodology. [293] at 11. The Court has rejected those arguments, and so the Court denies Think Green's motion to exclude Cohen's expert report.

### C. Carsten Faltum

Think Green also moves to strike portions of the expert report prepared by Medela expert Carsten Faltum. [295]. Resolving Think Green's motion to partially strike is not necessary to resolving the parties' summary judgment motions. *See, e.g., Serrano v. Menard, Inc.,* 671 F. Supp. 3d 877, 883 (N.D. Ill. 2023) (denying *Daubert* motion as moot when its resolution "is not necessary to resolving the summary judgment motion"); *Flagstar Bank, FSB v. Freestar Bank, N.A.,* 687 F. Supp. 2d 811, 821–22 (C.D. Ill. 2009) ("As the Court has determined that the expert report of Dr. Butters is not essential to ruling on the present Motions for Summary Judgment, the Court need not address the merits of Plaintiff's Motion to Strike. The Motion is therefore moot."). Think Green also hints that it may file a more robust motion to strike Faltum's report before trial. [296] at 1 ("There are many parts of Mr. Faltum's report that are problematic from a *Daubert* standpoint, but Think Green only addresses those portions that Medela relies on in its recently-filed motion for summary judgment."). In the interest of efficiency and avoiding piecemeal litigation, the Court therefore denies Think Green's motion to partially strike without prejudice to renewal.

### III. Motions for Summary Judgment

#### A. Legal Standards

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 624 (7th Cir. 2001).

#### B. Motions for Summary Judgment on Think Green's Trade Dress Claim.

Section 43(a) of the Lanham Act provides a cause of action against the unauthorized use of "any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a). Section 43(a) may apply to protect the design of a product when the resulting appearance is used to identify the product—the "trade dress"—as well as trademarks. *See* 15 U.S.C. § 1125(a)(3) (describing cause of action for "trade dress infringement"); *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 210 (2000). To prove trade dress infringement, a plaintiff must show: "(1) its trade dress is inherently distinctive or has acquired secondary meaning; (2) the similarity of the defendant's trade dress to that of the

39

plaintiff creates a likelihood of confusion on the part of consumers; and (3) the plaintiff's trade dress is non-functional." *Comput. Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1067–68 (7th Cir. 1992) (cleaned up).

Medela argues that Think Green has failed to raise a genuine dispute of material fact as to any of these elements. On the second element alone, Think Green takes the contrary stance, arguing that no genuine dispute of material fact exists that the similarity of Medela's trade dress to Think Green's trade dress creates a likelihood of confusion on the part of consumers. For the reasons that follow, the Court disagrees with both parties.

### 1. Secondary Meaning

Trade dress is only protectable if it is distinctive. *Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 291 (7th Cir. 1998). Distinctiveness can be shown if the trade dress is inherently distinctive or if it has acquired a "secondary meaning." *Id.* A product acquires a secondary meaning when consumers link its appearance with its producer. *Wal-Mart Stores*, 529 U.S. at 211; *see also Pride Commc'n Ltd. P'ship v. WCKG, Inc.,* 851 F. Supp. 895, 901 (N.D. Ill. 1994) ("Secondary meaning is described as showing that the primary significance in the minds of the consuming public is not the product but the producer.").

Secondary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and evidence of intentional copying. *See Packman v. Chicago Tribune,* 267 F.3d 628, 641 (7th Cir. 2001). Consumer surveys

40

are the best, most direct evidence of secondary meaning because they show what is in the minds of the product's consumers. *See S.A.M. Elecs., Inc. v. Osraprasop,* 39 F. Supp. 2d 1074, 1083 (N.D. Ill. 1999); *Minemyer v. B-Roc Representatives, Inc.,* 678 F. Supp. 2d 691, 704 (N.D. Ill. 2009).

To show that its pump has acquired secondary meaning, Think Green puts forth Harper's secondary meaning survey and other evidence concerning its sales volume, advertising, and intentional copying. As explained next, Think Green's evidence prevents judgment as a matter of law in Medela's favor on secondary meaning.

***Harper's Secondary Meaning Survey:*** From her survey, Harper concluded that Think Green's pump had acquired secondary meaning. *See* [314] at 19; [287-15] ¶ 256. In arguing that Think Green has failed to put forth evidence that its pump has acquired secondary meaning, Medela repeats the criticisms of Harper's work that it advanced when seeking to bar her report altogether. [288] at 16–20. The Court rejects these criticisms for the same reasons it has already provided.

In addition, when resolving a motion for summary judgment, the Court cannot do as Medela suggests and discount Harper's testimony. *Thomas & Betts,* 138 F.3d at 293 ("[I]t is not the province of the district court to so discount testimony on a motion for summary judgment; it must make all reasonable inferences in favor of the non-movant."). The Court already has determined that Harper's proffered testimony meets the *Daubert* threshold of relevance and reliability; it is now up to the jury to determine the credibility, accuracy, and weight of that evidence. *Lapsley v. Xtek, Inc.,*

41

689 F.3d 802, 805 (7th Cir. 2012); *Stollings*, 725 F.3d at 765 ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony.").

*Sales Volume:* Evidence of a product's commercial success is entitled to greater weight when held next to the time the product has been on the market. *See Turtle Wax, Inc. v. First Brands Corp.,* 781 F. Supp. 1314, 1324 (N.D. Ill. 1991). For example, the claim that a product of a "venerable pedigree" has acquired secondary meaning may be more likely than a claim of a "recent entry on the market" doing the same. *Heckler & Koch, Inc. v. German Sport Guns GmbH,* 71 F. Supp. 3d 866, 921 (S.D. Ind. 2014).

Here, the parties dispute, by a wide margin, how many pumps Think Green has sold and the relevant time period of those sales. [288] at 20; [314] at 22. Neither party explains the significance of these figures. *Id.* Still, Think Green has made at least a minimal showing of its pump's volume and history of sales. *Heckler & Koch,* 71 F. Supp. 3d at 921.

Medela argues that Think Green's figure alone is insufficient to establish secondary meaning as well as that Think Green cannot establish secondary meaning unless it is the *exclusive* producer of its trade dress. [288] at 20–21. Although it is true that evidence of sales alone is often insufficient to establish secondary meaning, *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 393 (7th Cir. 1992), that is not the case here. Think Green does not *only* present evidence of sales. As already discussed, it puts forward the strongest possible evidence of secondary meaning via

42

Harper's survey results. It is up to the jury to determine what weight, if any, to afford that survey. The volume of sales evidence and the degree to which Think Green may (or may not be) the exclusive producer of its trade dress are simply other possible indicia of secondary meaning.

*Advertising*: Advertising which encourages consumers to identify the claimed trade dress with the particular producer is evidence of secondary meaning. *Thomas & Betts,* 138 F.3d at 292. Instead of precisely pointing to such advertisements, though, Think Green merely gestures to the "millions of dollars" it spent on advertising. [314] at 22. Think Green points to Harper's estimated allocation of "spending to the trade dress," though it does not attempt to explain how these "millions of dollars" are actually related to that trade dress. *Id.* But the flimsy nature of this evidence and argument is immaterial where Think Green already has established a genuine dispute of fact as to secondary meaning through Harper's survey results and by sales volume.

*Intentional Copying*: Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's. *Thomas & Betts,* 65 F.3d at 663. Think Green refers the Court to the "ample evidence" purporting to show Medela's intent to copy its trade dress. [314] at 22. Medela disputes the meaning of the cited emails. [283] at 24 n.5. The significance

of these emails is open to interpretation, and a jury is in the best position to perform that job.[15]

### 2. Likelihood of Confusion

Think Green moves for summary judgment "on a narrow portion of its case": a finding in its favor that, as a matter of law, "confusion is likely in the post-sale context as between the parties' respective products." [275] at 8. Post-sale confusion occurs when a potential customer sees a product bearing the plaintiff's trade dress and mistakenly attributes the product to the plaintiff, thereby influencing his or her buying decision, either positively or negatively. *CAE,* 267 F.3d at 683.[16]

The likelihood of confusion is generally a factual question that is difficult to resolve at summary judgment. *See AHP,* 1 F.3d at 616. It is a rare trade dress case where the "evidence is so one-sided that there can be no doubt about how the question [of whether likelihood of confusion exists] should be answered." *CAE,* 267 F.3d at 677

---

[15] Medela also disputes that other evidence of secondary meaning—such as industry awards and media mentions—are sufficient to create a genuine issue of fact. [288] at 22–23. As noted above, however, because Think Green has already created a genuine dispute of fact as to secondary meaning, this evidence will advance to the jury.

[16] As a procedural matter, the Court rejects Medela's argument that Think Green's motion is "improper" under Federal Rule of Procedure 56(a). [316] at 3. Rule 56(a) explicitly contemplates that a party may move for summary judgment on a "*part* of [a] claim or defense." Fed. R. Civ. P. 56(a) (emphasis added). There is also some discussion of Rule 56(g). *See* [316] at 1; [340] at 3–4. This rule is "ancillary" to the ultimate summary-judgment analysis and operates only to "salvage some results" from the time and resources the Court spends in deciding an unsuccessful summary-judgment motion. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). Think Green could not have brought its motion under Rule 56(g).

(cleaned up).[17] Perhaps unsurprisingly, the likelihood of confusion analysis is not a straightforward one: It includes many non-dispositive factors, each weighed against the other, and each assigned different weight depending on the facts of the case. *Thomas & Betts*, 138 F.3d at 296. These factors include: (1) the similarity of the trade dresses; (2) the area and manner of concurrent use; (3) the degree of care likely to be used by consumers; (4) the strength of the plaintiff's trade dress; (5) actual confusion; and (6) the defendant's intent to pass its product off as the plaintiff's. *Id.*

In contending that each of these factors weigh in favor of a finding of likelihood of confusion, Think Green does not establish that the "evidence is so one-sided that there can be no doubt about how the question should be answered." *CAE,* 267 F.3d at 677. Instead, Think Green equivocates. For example, in arguing that its trade dress and Medela's trade dress are similar, it describes them as "*nearly* identical" in "*most* respects," despite "differences in the markings," "the existence of a flange," and "a tiny rear loop." [275] at 11–13. Then, in its reply brief, it attempts to minimize these distinctions as "trivial," "often not present or featured," "barely if at all visible," or "somewhat obscured." [340] at 5–6. In another instance, when discussing consumers' degree of care, Think Green notes that its pumps are "relatively inexpensive" (suggesting a lower degree of care) but also that their purchasers "tend to skew slightly more educated than the general population" (suggesting a higher degree of care). [275] at 13–14. It then writes that "it is not clear … that consumers would

---

[17] Moreover, as the court earlier assigned to this case noted, Think Green is perhaps putting the cart before the horse with this motion. The likelihood of confusion analysis is informed by whether Think Green's trade dress is protectable, [185] at 21, and Think Green concedes that its ownership of a protectable trade dress remains unsettled. [275] at 9–10.

exercise a higher degree of care distinguishing between products rather than relying on [its] reputation." *Id.* at 14. In other words, in both instances, Think Green has weighed the conflicting evidence and decided that it comes out on top. *E.g.*, *id.* at 14 ("To the extent that [the degree-of-care] factor carries much weight in the post-sale confusion analysis, it favors Think Green.").

In moving for summary judgment, Think Green asks the Court to do the same. But the Court cannot weigh the evidence: That task is reserved for the jury at trial. *Taylor v. City of Milford,* 10 F.4th 800, 806 (7th Cir. 2021); *see also Imperial Serv. Sys. v. ISS Int'l*, 701 F. Supp. 655, 658 (N.D. Ill. 1988) (questions regarding the degree of similarity between two trademarks are "peculiarly jury questions").

In the same vein, when discussing two other factors, Think Green credits its expert's findings over the contrary findings and criticism of Medela's expert. [275] at 16–17 (arguing that its trade dress is strong); 18 (arguing that actual confusion exists); *see also* [340] at 11–14, 16–19 (defending its expert's methodology and criticizing Medela's). But determinations of expert credibility are left for the jury. *Stollings*, 725 F.3d at 765; *see also Morningware, Inc. v. Hearthware Home Prods., Inc.*, No. 09 C 4348, 2012 WL 3721350, at *12 (N.D. Ill. Aug. 27, 2012) (denying plaintiff's motion for summary judgment because "[w]hile Mr. Berger's survey opinions provide a sufficient evidentiary basis for a jury to conclude that Hearthware's conduct caused actual consumer confusion, a jury could also find that Mr. Berger's survey methodology was flawed and thus created inaccurate results").

46

Finally, Think Green puts forth excerpts of emails exchanged among Medela employees as evidence that Medela intended to pass off its pump as Think Green's. [277] at 19–20; [278-5]. The excerpts are unconvincing for that purpose. In at least some of the quoted emails, the employees discuss their desire to *avoid* copying Think Green's pump and—crucially—never evince a desire to pass their pump off as Think Green's. *See* [278-5] at 5 ("I do not believe this is a winning strategy."); *id.* at 6 ("[W]e need to be more innovative."); *id.* at 7 (discussing potential advantages of Medela's pump over Think Green's). "[I]nternal emails" that "can be read as indicating that [the defendant] was actively trying to design a product that did *not* copy" a competitor's trade dress is such weak evidence of intentional copying that it is almost without value. *Competitive Edge, Inc. v. Staples, Inc.,* 763 F. Supp. 2d 997, 1016 (N.D. Ill. 2010) (emphasis added), *aff'd,* 412 F. App'x 304 (Fed. Cir. 2011). Although other email excerpts appear to support Think Green's narrative, in asking the Court to interpret this entire body of emails as unequivocal proof of Medela's intent to pass off Think Green's trade dress as its own, Think Green is asking the Court to "choose between competing inferences." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). Yet again, the Court cannot do so at summary judgment. *Id.*

As for Medela's competing summary-judgment motion, it argues that no genuine dispute of material fact exists as to the *absence* of likelihood of confusion. [288] at 24. Although Medela stakes out the opposite position from Think Green, its argument proves just as unsuccessful. It hinges on critiques of Harper's expert report that the Court already has determined are for a jury to parse. *Id.* at 24–30.

### 3. Functionality

#### 1. Relevant Legal Background

If a design is functional, it is not entitled to trade dress protection. *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.,* 955 F.3d 632, 644 (7th Cir. 2020). The party asserting trade dress protection has the burden of proving that the design sought to be protected is not functional. 15 U.S.C. § 1125(a)(3).

A product design is "functional" and cannot serve as a trade dress if it is essential to the use or purpose of the product, affects the cost or quality of the product, or if the exclusive use of the design would put competitors at a significant non-reputational disadvantage. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 29 (2001); *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995). In other words, if the design allows the product to operate or improves it in some way—e.g., by making it cheaper, faster, lighter or stronger—the design is functional. *Jay Franco & Sons, Inc. v. Franek,* 615 F.3d 855, 857 (7th Cir. 2010). A design does not need to be the only, or the best, way to do things to be considered functional: It only needs to represent one of many solutions to a problem. *Arlington Specialties, Inc. v. Urban Aid, Inc.,* 847 F.3d 415, 419 (7th Cir. 2017).

The Seventh Circuit offers five factors useful for evaluating whether a certain design is functional:

1. whether a utility patent involves or describes the design's functionality;
2. the design's utilitarian properties;
3. whether the product is advertised in a way that touts the design's utilitarian advantages;
4. whether there are other designs that would serve the product's purpose (or whether any other designs would be difficult to create); and

5. the design's effect on the product's quality or cost.

*Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.,* 647 F.3d 723, 728 (7th Cir. 2011). No factor alone is dispositive. *Flexible Steel Lacing,* 955 F.3d at 644. However, if the design is otherwise shown to be functional (for example, through evidence of a utility patent), evidence of alternative designs will not create a factual issue of functionality. *Id.*

If a plaintiff seeks to protect an overall design—in other words, a "particular combination and arrangement" of elements—the Court evaluates the overall trade dress, rather than focusing on the individual elements. *Comput. Care,* 982 F.2d at 1071 (rejecting an "atomized approach" of determining that certain features of a design were functional).

Functionality is fundamentally a question of fact. *Specialized Seating,* 616 F.3d at 726. To survive summary judgment, Think Green must raise a genuine issue of material fact that its trade dress is non-functional. *Heckler & Koch, Inc,* 71 F. Supp. 3d at 915 (citing *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1262 (9th Cir. 2001)). Though this is a factual question, "the bar for functionality is so low that it can often be decided as a matter of law." *Arlington Specialties, Inc.,* 847 F.3d at 419–420.

## 2. Think Green's Asserted Trade Dress

According to Think Green, its asserted trade dress is as follows:

the first-of-its-kind three-part shield-collector-base configuration, wherein the collector is bulbous yet fits underneath the outer diameter of the shield and contains an ornamental rib in its top part, while the

base flares out from the bottom of the collector bulb to meet the surface upon which the whole unit rests.

[1] ¶ 18. This is the trade dress asserted in Think Green's complaint. *Id.* It is also how the court earlier assigned to this matter understood Think Green's claim. *E.g.*, [96] at 532–33; [185] at 3.

As a preliminary matter, in moving for summary judgment, Medela claims that Think Green has "re-defined" and "narrow[ed]" its trade dress through its trade dress expert. [288] at 6–7. Think Green objects to this "redefinition," appropriately pointing out that a party's expert cannot "redefine" its trade dress because trade dress is based on a product's "appearance and design," not the words used to describe that appearance. [315] ¶ 3. The Court thus understands Think Green's asserted trade dress to be the shield-bulb-base arrangement articulated in the complaint. It now turns to assessing Medela's claim that no genuine issue of material fact exists that this three-part configuration is functional, using the five aforementioned factors articulated in *Georgia-Pacific*.

### 3. Factor 1: The existence of a utility patent

Utility patents are excellent "cheat sheets" for determining functionality. *Georgia-Pacific,* 647 F.3d at 728. Because the Patent and Trademark Office only grants utility patents for "unique and useful" inventions, utility patents are "strong evidence that the features therein claimed are functional." *TrafFix,* 532 U.S. at 29, 31; *see also* 35 U.S.C. § 101 (an issued patent requires a conclusion by the Patent and Trademark office that a product was sufficiently "new and useful"). If the "central

50

advance" claimed in the utility patent matches the "essential feature" of the trade dress, then there is a strong presumption that the design is functional. *Id.*[18]

Medela argues that Think Green has conceded that the shield-bulb-base arrangement is functional, not trade dress, through its affiliate's[19] filing of an "international Patent Cooperation Treaty Utility Patent application" ("the '574 Application"). [288] at 10. Medela does not rebut Think Green's assertion that the '574 Application "has not matured into an issued patent and was never 'nationalized' as a pending application in any country." [314] at 10. Instead, Medela cites a Federal Circuit opinion holding that "an applied-for utility patent that never issued has evidentiary significance for the statements and claims made in the patent application concerning the utilitarian advantages, just as an issued patent has evidentiary significance." [288] at 10; [341] at 3 (citing *Valu Eng'g, Inc. v. Rexnord Corp.,* 278 F.3d 1268, 1279 (Fed. Cir. 2002)).

But Medela does not explain why *Valu Engineering*—in which the Federal

---

[18] Some examples of a patent's "central advance" matching an "essential feature" of a trade dress are: a temporary traffic sign's dual-spring design, *TraFix,* 532 U.S. at 30; a child-safe, leak-resistant container cap, *Berlin Packaging, LLC v. Stull Tech., Inc.,* 381 F. Supp. 2d 792, 802 (N.D. Ill. 2005); a diamond lattice design, filled with signature bosses, embossed atop toilet paper, *Georgia-Pacific,* 647 F.3d at 728 (7th Cir. 2011); a round wrench head with symmetrically spaced gripping elements, *LoggerHead Tools, LLC v. Sears Holding Corp.,* No. 12-CV-9033, 2016 WL 5112020, at *4 (N.D. Ill. Sept. 20, 2016); the "circular, convex" shape of a thermostat, *Eco Mfg. LLC v. Honeywell Int'l, Inc.,* 295 F. Supp. 2d 854, 874 (S.D. Ind.); or the circular shape of a beach towel. *Franek v. Walmart Stores, Inc.,* No. 08-CV-0058, 2009 WL 674269, at *14 (N.D. Ill. Mar. 13, 2009).

[19] Ownership of the utility patent is irrelevant to this analysis. "The key is not who owns these patents, but rather what they disclose." *In re Vishrup,* 42 U.S.P.Q.2d 1403, 1405 (T.T.A.B.1997); *see also McCarthy on Trademarks and Unfair Competition,* § 7:89.30 ("A functional utility patent is strong evidence of functionality regardless of who owns or owned the patent.").

Circuit reviewed the Trademark Trial and Appeal Board's consideration of an abandoned patent application in determining whether certain design elements were eligible for trade protection—should apply to a court's Lanham Act analysis. *See Jenny Yoo Collection, Inc. v. Essence of Australia, Inc.,* 448 F. Supp. 3d 1162, 1172 (D. Kan. 2020) (declining to understand *Valu Engineering* as requiring a court to consider the content of an abandoned patent application when assessing a trade dress infringement claim brought under the Lanham Act); *M3Girl Designs, LLC v. Blue Brownies, LLC,* No. 3:09-CV-2390-F, 2012 WL 12885058, at *2 (N.D. Tex. Mar 9, 2012) (same). Nor does Medela cite any other authority for the premise that a pending, abandoned, or rejected patent application has the same effect as an issued or expired patent. *See Miche Bag, LLC v. Marshall Grp.*, 818 F. Supp. 2d 1098, 1104 (N.D. Ind. 2010) (finding no authority for the proposition that a pending patent application has the same effect as an expired patent).

As a result, the Court is not inclined to view the '574 Application as a reliable indicator of the shield-bulb-base arrangement's functionality. A never-approved patent application, like the '574 Application, could include any number of useless features that would never have passed muster with the Patent and Trademark Office. Logically, only approved or expired utility patents carry indicia of reliability that a feature was indeed "useful" rather than decorative.[20]

---

[20] In its reply, Medela quotes 35 U.S.C. § 363, which allows that an "international application designating the United States shall have the effect, from its international filing date under article 11 of the treaty, of a national application for patent regularly filed in the Patent and Trademark Office." But Medela's argument still does not explain how the Court can treat a pending, unapproved patent application as proof of functionality.

Even if the Court did consider the '574 Application as part of its functionality assessment, it still would not be persuaded that it evinces the functionality of Think Green's claimed trade dress. [288] at 10. To support this argument, Medela provides a chart. *Id.* at 10–11.[21] On one side of the chart, Medela lists features of Think Green's trade dress. *Id.* On the other side, it provides quotes from the English translation of the '574 Application. *Id.* But nowhere does Medela identify the "central advance" of the '574 Application or allege that it matches the "essential feature" of the claimed trade dress. *TrafFix,* 532 U.S. at 29, 31. According to Think Green, the '574 Application "claims as its 'central advance' a way of making the outer perimeter of a breast shield so that it better remains adhered to a woman's breast under vacuum pressure." [314] at 10. But to support this claim, Think Green cites broadly (and unhelpfully) to the entire 46-page '574 Application. *Id.*

So the question remains: What is the "central advance" of the '574 Application? Normally, in patents issued by the U.S. Patent and Trademark Office, courts look to brief summaries of the invention, like the patent's "abstract," to ascertain its "central advance." *See Franek v. Walmart Stores, Inc.,* 08-CV-0058, 2009 WL 674269, at *14 (N.D. Ill. Mar. 13, 2009), *aff'd sub nom. Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855 (7th Cir. 2010) (looking to the "brief summary of the invention" section to determine the patent's "central advance"); *Georgia-Pacific,* 647 F.3d at 728–29 (looking to the patent's "abstract" section to determine its "central advance"). Here,

---

[21] Some of these quotes appear taken out of context. The first quoted portion, for example, only states that "[t]he breast pump flanges of *most silicone breast pumps in related technologies* adopt" certain features. *Id.* at 1. This statement is relevant to "most silicone breast pumps"—not Think Green's pump specifically.

however, the "summary" and "abstract" sections of the English language translation of the '574 Application offer no assistance. [287-6] at 24–25, 40.

There appear to be problems of translation, or clarity, or both. The "summary" describes a breast pump that has "strong adsorption [sic] force and sufficient fixation force, is not easy to fall off, can be used without hand." [287-6] at 25. It goes on to describe the pump as both "integrally formed," but also states that it "does not include many parts." *Id.* The pump flange "is of a structure having an opening on each of two ends." *Id.* One end is connected to "an opening of the bottle body," and at the other end, "[a] seal ring is annually arranged." *Id.* The "abstract" similarly describes an "integrally manufactured" silicone pump consisting of a bottle body and flange. *Id.* at 40. Its focus seems to be on a "seal ring," which as Think Green points out, is disclaimed in its trade dress application. [314] at 10.

At bottom, as far as the Court can tell, there is no easily discernable "central advance" in the '574 Application and the parties' briefs on this point are not helpful. This is a problem for Medela, which has not persuasively shown the Court that the "central advance" of an existing or expired patent matches the "essential feature" of Think Green's asserted trade dress. And although the absence of a utility patent does not preclude the functionality of a design, the lack of a presumption of functionality does make it considerably less likely that functionality can be determined on summary judgment. *See Heckler & Koch,* 71 F. Supp. 3d at 915–16.

54

### 4. Factor 2: The design's utilitarian qualities

Relying on the opinions of one of its experts, Faltum, Medela argues that Think Green's asserted trade dress has utilitarian qualities, such that barring Medela from using it would put Medela at a significant non-reputational disadvantage. [288] at 12. The Court is unpersuaded that Faltum's opinions permit judgment as a matter of law in Medela's favor.

Faltum opines that the shape of Think Green's design is ideally suited for the human hand, while other shapes are "awkward to hold, difficult to manipulate, inferior in performance," and less effective at creating a vacuum seal. [288] at 12–13. To support these findings, Medela presents the images below:

   

*Id.* Citing a rebuttal declaration from its expert, Tim Fletcher, Think Green criticizes these findings as "made up" and "facially nonsensical." [314] at 13–14; [300-9] ¶ 4.

The Court shares Think Green's skepticism. Faltum's images attempt to liken three-dimensional pumps with two-dimensional shapes and to suggest that one two-dimensional shape is easier to hold than the other, while fully disregarding the prominent breast shield topping the pumps. These images and accompanying analysis strike the Court as incomplete and overly simplistic and, therefore, unpersuasive. *See Comput. Care,* 982 F.2d at 1071 (rather than "atomiz[ing]" trade

dress into its separate parts, courts must take the overall combination and arrangement into account). Moreover, between Faltum's and Fletcher's opinions, it is the jury's assessment of the two that matters, not the Court's. *Wipf*, 519 F.3d at 385 ("[I]n a case of dueling experts ... it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony.").

The same is true for Medela's claim that the bulb design is more effective and efficient at creating the vacuum "essential for these collectors." [288] at 13. The jury may determine what weight to afford this claim, which was based on a study Faltum conducted that tested how much water various pumps could draw through a hose from a beaker when the bulb was compressed and released. [287-12] at 14–15. As Think Green points out, the testing only purported to "demonstrate that there is a statistically significant difference in the efficiency with which liquid is collected by one-piece silicone breast milk collectors as a consequence of their shape." [287-12] at 15. Because the test did not appear to evaluate other potential utilitarian features of a pump (such as adherence or comfort) whether this alleged difference in water-drawing efficiency translates into a more effective vacuum "essential for these collectors" remains a factual question.

Medela also cites Faltum's opinion regarding the utility of the pump's rib placement. Not only is this opinion disputed by Fletcher, [300-9] ¶ 12, but Think Green also points to the Lansinoh pump, which is popular with consumers despite its different rib placement. [314] at 15. Likewise, Fletcher disputes Faltum's contention that the pump, by virtue of its design, "comfortably fits the majority of women." [288]

at 13; [278-2] at 32. And Think Green counters Medela's statement that the suction base is ideal for stability, [288] at 14, by pointing to several other similar pumps that use different types of non-suction bases to provide stability, [314] at 16–17.

In short: Though Medela, through its expert, points to a laundry list of design features it claims possess utilitarian qualities, [288] at 12–14, Think Green has raised sufficient factual questions to survive summary judgement.

### 5. Factor 3: The existence of advertising touting the design's utilitarian qualities

If a plaintiff's advertising "unequivocally link[s]" its design to some functional benefit(s), the Court may weigh those claims against the plaintiff's claims of non-functionality. *See Georgia–Pacific,* 647 F.3d at 730. For example, in *Georgia-Pacific,* the plaintiff sought to protect its toilet paper's quilted design. *Id.* But in advertisements, the plaintiff specifically touted its quilted design as offering "thousands of places for moisture to go" and "exceptional softness and comfort." *Id.* The Seventh Circuit found that these advertisements "unequivocally linked" the quilted design to functional benefits like absorbency, softness, and comfort. *Id.*

Medela accuses Think Green of twice touting its design's utilitarian advantages. First, Medela alleges that Think Green "advertises [that] the configuration of its breast shield advantageously accommodates different breast sizes." [288] at 9. To support this assertion, Medela cites to its fifth statement of material fact, which alleges that Think Green "advertises, on its Haakaa Gen 2 product labels, that the configuration of its breast shield advantageously accommodates different breast sizes." [287] ¶ 5. To support *that* assertion, Medela

cites generally to [287-3]. This exhibit appears to be a product label for the Haakaa Gen. 2 pump. *Id.* The only piece of this label (shown below) that could possibly support Medela's allegation is the first of seven bullet points, which reads: "Accommodates different breast sizes." *Id.*



As Think Green points out, this phrase only refers to the product's accommodation of breast sizes generally. [314] at 8–9. Nowhere in the product label does Think Green explicitly attribute its pump's "advantageous[] accomodat[ion]" of different breast sizes to the breast shield's "configuration." To draw such a link, a

factfinder would have to infer that *only* the "configuration" of the breast shield, as opposed to any other aspect of the pump, could permit the accommodation of different breast sizes. While this may end up being a reasonable inference for a juror to make, because the cited advertisement itself draws no "unequivocal" link between the pump's accommodation of breast sizes and the breast shield's "configuration," summary judgment would be inappropriate. *Thomas & Betts,* 138 F.3d at 299–300 (material question of fact excited concerning whether certain advertisements were about the asserted design feature or other features of the product).

Second, Medela alleges that Think Green's marketing "emphasizes the utility of its suction base." [288] at 9. To support this assertion, Medela cites several advertisements. *Id.* at 9–10. The first comes from Think Green's online order page for its Haakaa Generation 2 pump, [287-4] at 2, which is depicted next:

We've updated the famous Haakaa Silicone Breast Pump! Although it works in the same way as the original Haakaa breast pump, our new pump has a few added features to make your life that little bit easier. Available in two larger capacities of 100ml and 150ml, and with a new suction base that sticks to flat surfaces to prevent accidental spills, it is the easiest and most simple way to express breast milk.

One sentence is relevant to Medela's argument: "Available in two larger capacities of 100ml and 150ml, and with a new suction base that sticks to flat surfaces to prevent accidental spills, it is the easiest and most simple way to express breast milk." *Id.*

59

The second advertisement is a video on Think Green's Amazon webstore for its Haakaa Gen. 2 pump, which includes a video of the suction activated against a flat surface and superimposed text reading: "Additional suction base sticks firmly to flat surface to reduce falling risks." [287] ¶ 7.



The third advertisement, also from Think Green's Amazon webstore, features photographs of the suction base activated against a flat surface (with arrows signifying its activation) and the removal of the suction base from the flat surface. *Id.* ¶ 8. Below the photographs are the words "Suction Base Design" and a bullet point explaining that the "[s]uction base sticks securely to flat surfaces to remain upright and prevent spill." *Id.*



**Suction Base Design**

- Suction base sticks securely to flat surfaces to remain upright and prevent spill.
- Express your milk with the power of continuous suction.

Each of these advertisements refers to the suction base generally. None refer more precisely to the *design* of the pump's suction base (e.g., its size or shape), or, more importantly, the overall design of the pump. *Comput. Care,* 982 F.2d at 1071 (rejecting an "atomized approach" to functionality analysis). Nor did any of Think Green's advertising ever claim that its suction design features worked better than other suction bases—for example, the advertisements never claimed that the flared design had more sticking power, or that the size of the base or the way it connected to the collection bulb offered more stability. *See Bodum USA, Inc. v. A Top New Casting Inc.,* 927 F.3d 486, 493 (7th Cir. 2019) (where a plaintiff's advertising "never claimed any of its design features worked better than other options … a reasonable jury could weigh this evidence against a finding of functionality in the legal trade dress sense"). In short, none of these advertisements urge consumers to purchase the pump on the strength of any particular utilitarian quality of the suction base's design. *See Heckler & Koch, Inc.,* 71 F. Supp. 3d at 918.

For these reasons, the Court affords little weight to the advertisements Medela cites in support of its functionality argument.

### 6. Factor 4: The impossibility or difficulty in creating other designs that serve the design's same purpose

A design is likely to be considered functional if it represents a "solution to a problem" and creating other designs that solve that same problem would be difficult or impossible. *Specialized Seating,* 616 F.3d at 727 (where a folding chair's design achieves a desirable "strength to weight ratio," and alternative designs that achieve that same ratio would be difficult or impossible, the design is functional).

Think Green argues that there are numerous successful, highly rated alternative silicone one-piece breast pumps that are designed differently than, but function the same as, Think Green's pump. [314] at 6–7. In particular, Think Green points to Lansinoh's silicone breast pump which "lacks the overall claimed trade dress for having a bottom-weighted pear-shaped collector (rather than ovoid)." *Id.* at 7–8. Still, Lansinoh's product is sold at a lower price, and boasts more, and higher, ratings. *Id.* Think Green also leans on its expert's identification of several other designs, based on both existing patents and patent applications, and the expert's own rough designs of various breast pumps. *Id.* at 7.

Medela argues that Think Green's invocation of the Lansinoh pump should be stricken pursuant to the "sham affidavit" rule because Think Green "manufacture[d] a factual dispute via an expert declaration that contradicts its own sworn admissions." *See* [341] at 4, n.4. But the sham affidavit rule forbids litigants from creating sham issues of fact with affidavits that contradict prior deposition testimony. *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018); *Janky v. Lake Cnty. Convention and Visitors Bureau,* 576 F.3d 356, 362 (7th Cir. 2009). So, if a witness's deposition and a later supplemental affidavit conflict, the affidavit must typically be disregarded. *Velez v. City of Chicago,* 442 F.3d 1043, 1049 (7th Cir. 2006) (quoting *Amadio v. Ford Motor Co.,* 238 F.3d 919, 926 (7th Cir. 2001)). That is not what happened here. Rather, a Think Green corporate representative's testimony was later contradicted by a Think Green expert witness. [341] at 4 n.4. This scenario is not one of a sham affidavit, but of two separate witnesses offering differing testimony.

Where Think Green has presented evidence that other non-infringing designs are available, a triable issue of fact exists on functionality. *See Heckler & Koch,* 71 F. Supp. 3d at 919.

### 7. Factor 5: The effect of the design on the product's quality or cost

Think Green denies that its trade design makes its pump's manufacturing process simpler or less expensive than other silicone manual breast pumps. [314] at 12–13. Citing its expert (Fletcher), Think Green argues that the cost of its design is *higher* than the cost for a differently designed silicone one-piece pump, even though the pertinent products from Think Green, Medela, and other competitors are made using the same liquid injection molding process. *Id.*; *see also* [300-7] at 35 (although Think Green's silicone one-piece pump is less expensive to produce than Medela's, it is more expensive to produce than a competitor's pump). *Id.* Think Green therefore has raised a triable issue of fact as to whether its design makes it pump simpler or less expensive than competitor pumps, which bears on the issue of functionality.

\* \* \*

Because issues of material fact remain as to trade dress infringement, Medela's motion for summary judgment as to trade dress is denied. [281].

### C. Medela's Motion for Summary Judgment on Think Green's False Advertising and Illinois Deceptive Trade Practices Act Claims.

A false advertising claim under the Lanham Act and Illinois Deceptive Trade Practices Act requires proof of five elements. In resolving Medela's motion, the Court has determined that it only needs to address the last of these elements: injury. To

prevail on both claims, Medela must show that it "has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *see also Long Grove Invs., LLC v. Baldi Candy Co.*, 397 F. Supp. 3d 1190, 1198 (N.D. Ill. 2019*)* (in Illinois, courts resolve Illinois Deceptive Trade Practices Act claims according to the principles set forth in the Lanham Act).

Ordinarily, a plaintiff bringing a false advertising claim under the Lanham Act must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 133 (2014); *see also Eli Lilly & Co. v. Arla Foods, Inc.,* 893 F.3d 375, 381–82 (7th Cir. 2018) (satisfying this element "requires proof of an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."). Citing a Second Circuit case, Think Green alleges there is an exception to this rule under which it falls: Where a plaintiff and defendant are in direct competition with each other, it can be presumed that defendant's false advertisement necessarily takes away from plaintiff. *See Merck Aprova AG v. Gnosis S.p.A.,* 760 F.3d 247, 260–261 (2d Cir. 2014). But there is more to this presumption. To be "in direct competition with one another," the two parties must be the *only two competitors* in the relevant market. *Id.* ("We hold that where, as here, a plaintiff has met its burden of proving deliberate deception in the context of a two-player market, it is appropriate to utilize a presumption of injury."); *In re C2R*

*Glob. Mfg., Inc.,* No. 18-30182-BEH, 2020 WL 5941330, at \*19 (Bankr. E.D. Wis. Oct. 6, 2020) (citing *Merck* and declining to presume injury when the two parties were not the only competitors in the relevant market). Think Green does not claim that it and Medela are the only two competitors in the relevant market.

There is otherwise no evidence in the record that Think Green was injured because of Medela's false advertisements. In fact, Think Green only contends that the first of three allegedly false advertisements—promoting an "anti-spill" feature as setting Medela's pump apart from its competitors—even implicated it. [314] at 33. Think Green has not presented any evidence, for example, that it retained its customers in the wake of this false advertising "by spending an abundance of time, energy, and money to combat [that] false advertising." *Underground Sols., Inc. v. Palermo,* 188 F. Supp. 3d 717, 731 (N.D. Ill. 2016); *see also FireBlok IP Holdings v. Hilti, Inc.*, No. 19-CV-50122, 2025 WL 1557924, at \*5 (N.D. Ill. June 2, 2025) ("FireBlok did not point to evidence of, nor did it even assert, that it was injured in its motion … FireBlok first argues that its injury is 'self-evident' by the very nature of the parties' competitive relationship … However, FireBlok provides no case law in support of this assertion.").

Because Think Green has failed to dispute that it was not injured by Medela's allegedly false advertisements, the Court grants Medela's motion for summary judgment as to Think Green's false advertising claim. *See Not Dead Yet Mfg. Inc. v. Pride Sols., LLC,* No. 13 C 3418, 2018 WL 688324, at \*10 (N.D. Ill. Feb. 2, 2018) ("Plaintiff presented no evidence, or argument, that Defendants' allegedly misleading

statements … would have any effect on consumers' purchasing decisions. That lack of evidence also dooms Plaintiff's claims under the Lanham Act.").

## IV. Conclusion

For the reasons stated above, Medela's motion for summary judgment is denied as to Think Green's trade dress claim and granted as to Think Green's false advertising claim. [281]. Think Green's motion for partial summary judgment on the issue of post-sale likelihood of confusion is denied. [274]. The motions to exclude or strike Harper's and Cohen's testimony are denied. [292], [303], [331]. The motion to strike portions of Faltum's testimony is denied as premature and may be renewed before trial. [295].

The Court sets an in-person status hearing for July 31, 2025, at 9:30 a.m. In advance of the status hearing, the parties are directed to meet and confer on potential trial dates as well as the possibility of settlement.

_____
Georgia N. Alexakis
United States District Judge

Date: July 2, 2025